JUSTIN D. HEIDEMAN (USB # 8897)
**HEIDEMAN, MCKAY, HEUGLY & OLSEN, LLC**
2696 North University Ave., Suite 180
Provo, Utah 84604
Telephone: (801) 812-1000
Fax: (801) 374-1724
Email: heideman@hmho-law.com
*Attorney for Plaintiff*

---

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| AARON JENSEN,<br><br>        Plaintiff,<br><br>vs.<br><br>WEST JORDAN CITY, a Utah municipal corporation, DAN GALLAGHER, in his official capacity, ROBERT SHOBER, in his official capacity, and DOES 1-10,<br><br>        Defendants. | **COMPLAINT<br>AND<br>JURY DEMAND**<br><br>Case No.: 2:12-cv-00736-PMW<br><br>Judge: Paul M. Warner |

Plaintiff Aaron Jensen, pursuant to Fed. R. Civ. P. 8(a), hereby complains and alleges for a cause of action against Defendants West Jordan City, Dan Gallagher, Robert Shober, and Does 1-10, as follows:

### PRELIMINARY STATEMENT

This is a civil rights action in which the Plaintiff, Aaron Jensen, seeks relief for the Defendants' violation of his rights guaranteed by the United States Constitution, specifically the Fourteenth Amendment, and further secured by the Civil Rights Act of 1871, 42 U.S.C. § 1983 and § 1988, by Title VII, by contract, and by the laws of the state of Utah.  Plaintiff seeks

damages, both compensatory and punitive; affirmative and equitable relief; an award of attorney fees, costs, and interest; and further relief as this Court deems just and equitable.  This is an action at law to redress a deprivation under color of statute, ordinance, regulation, custom, or usage of a right, privilege, and immunity secured to Plaintiff by the Constitution of the United States, and arises under the laws and statutes of the State of Utah.

## JURISDICTION AND VENUE

1.      This action arises under the United States Constitution and federal law, particularly under the provisions of the Fourteenth Amendment of the Constitution of the United States, and 42 U.S.C. § 1983 and § 1988.

2.      This action seeks redress for violations of the civil rights laws of the United States, and jurisdiction is therefore invoked pursuant to 28 U.S.C. § 1343 and 42 U.S.C. § 1983.

3.      The claims made in this Complaint occurred and arose in the State of Utah, in this District, and in the Central Division.  Venue is therefore proper under 28 U.S.C. § 1391 and 28 U.S.C. § 1331.

4.      Plaintiff seeks damages under federal law pursuant to the claims for relief specified below, in amounts to be established at trial.

5.      This Court has authority to award costs and attorney fees pursuant to 42 U.S.C. § 1988.

6.      This Court also has jurisdiction over any pendent state claims Plaintiff may wish to bring, or has brought, pursuant to 28 U.S.C. § 1367.

## PARTIES

7.      Plaintiff Aaron Jensen ("Plaintiff") is a citizen of the United States of America and a resident of the State of Utah.

8.      At the time the acts upon which this Complaint is based occurred, Plaintiff was residing and working in Salt Lake County, State of Utah.

9.      Defendants Dan Gallagher ("Lt. Gallagher" or "Cpt. Gallagher") and Robert Shober ("Lt. Shober") at all times relevant herein were employed by West Jordan City, State of Utah.

10.     This action is brought against each of these officers in their official capacities.

11.     The Defendant police officers' authority to act derives from Utah State law and/or the commands and directives of their superiors.

12.     All of the acts of the individuals and entities listed herein were performed under the color of the laws, statutes, ordinances, regulations, policies, customs, and usages of West Jordan City, and each said individual or entity is liable under 42 U.S.C. § 1983.

13.     At the time the acts upon which this Complaint is based occurred, the Defendant police officers were acting in their official capacity for West Jordan City.

14.     Defendant West Jordan City is a municipal corporation domiciled within and owing its existence to the laws of the State of Utah.

15.     Plaintiff served notice of his pendent state claims, if any, against Defendants pursuant to Utah law.

## GENERAL ALLEGATIONS

16.     Aaron Jensen began working for the West Jordan Police Department in 1996.

17.     Over a period of more than ten years, Mr. Jensen was subjected to a hostile work environment, most of which was caused by Lt. Gallagher.

18.     For years, Mr. Jensen was subjected to crude jokes from Lt. Gallagher about Mr. Jensen being gay.[1]

19.     Upon information and belief, the earliest jokes began in 1997 when Lt. Gallagher joked with Mr. Jensen to put his pen in a deceased woman's anus while they were waiting for the medical examiner to arrive.

20.     That same year, while on location in response to a lewdness complaint, Lt. Gallagher joked with Mr. Jensen, saying the Mr. Jensen goes home and masturbates so why was it not ok for a man to masturbate in a video store.

21.     The jokes about being gay continued, despite Mr. Jensen introducing other officers, including Lt. Gallagher, to his girlfriend at the time.

22.     Lt. Gallagher told Mr. Jensen's then-girlfriend that she was just a cover up for Mr. Jensen's gay desires.

23.     The jokes about Mr. Jensen being gay continued and permeated to all the officers of the department to the point where, by early 2000. Even the Chief of Police, Chief McGuire, joked about Mr. Jensen being gay.

24.     In August 2000, Mr. Jensen assisted other officers on a sex crime investigation involving an officer from another department having sex with young boys.

---

[1] The terminology and descriptions used in this Complaint, although graphic at times, are generally understood by the public and those that were specifically used by the Defendants with respect to the alleged incidents and conducts set forth therein.

25.     While in the home during the investigation, Lt. Gallagher was processing evidence and he pointed out numerous dildos found in the basement.

26.     In front of other officers, Lt. Gallagher pointed to the dildos and asked Mr. Jensen how Mr. Jensen got them up his ass.

27.     In the same home, upon discovering semen on walls, Lt. Gallagher asked Mr. Jensen in front of other officers how "you guys" got semen all the way up on the walls.

28.     Also, Lt. Gallagher pointed to the young boys found in their underwear and detained in the home and asked Mr. Jensen if they turned him on, calling Mr. Jensen a sick pervert while doing so.

29.     Mr. Jensen notified Lt. Shober of the harassment and threats from Lt. Gallagher as early as late 2000. Nothing was done to remedy the behavior.

30.     Mr. Jensen made several other attempts to notify his superiors that this harassment was unacceptable, even to the point of standing and yelling in a staff meeting in early 2001 that such behavior was inappropriate and he was tired of it.

31.     Despite these efforts by Mr. Jensen, the jokes continued, although less frequently over the next few years.

32.     In September 2003, Mr. Jensen married his wife now of nine years.

33.     Lt. Gallagher made it a point to have a conversation with Mr. Jensen's wife several times about Mr. Jensen being gay and how he just married her so that people would not think he is gay.

34.     After being promoted to Sergeant in June 2004, even the Chief of Police told Mr. Jensen's mother, wife, brother, and sister-in-law that for years he thought Mr. Jensen was gay.

35.     In September 2006, Mr. Jensen was transferred to work directly under Lt. Gallagher, which subjected Mr. Jensen to continued brutal harassment.

36.     Several times during 2006, Mr. Jensen found notes and messages in his office saying "you're gay."

37.     Lt. Gallagher and Sgt. Richard Davis ("Sgt. Davis") made numerous comments every week about Mr. Jensen being gay or having gay sex.

38.     In late 2007, Mr. Jensen confided in Sgt. Reed Motzkus ("Sgt. Motzkus") about the harassment to which he was being subjected, and the struggle Mr. Jensen had in notifying his superiors of it.

39.     Sgt. Motzkus spoke with Lt. Gallagher concerning the matter, and the jokes stopped for only a brief period of time.

40.     Lt. Gallagher was promoted to Captain.

41.     In December 2007, Mr. Jensen's wife suffered a miscarriage.

42.     In May 2008, Cpt. Gallagher asked Mr. Jensen how the pregnancy thing was coming.

43.     Mr. Jensen responded that they were trying, and at that point Cpt. Gallagher commented that he would be happy to help Mr. Jensen; that he would go to Mr. Jensen's house and Cpt. Gallagher would get Mr. Jensen's wife pregnant.

44.     This was extremely upsetting to Mr. Jensen, but he could not do anything since Cpt. Gallagher was his direct superior.

45.     In August 2008, Mr. Jensen announced that his wife was pregnant. Cpt. Gallagher joked "the baby can't be yours; we all know that you're gay."

46.     In September 2008, Cpt. Gallagher asked Mr. Jensen how his wife was doing, and Mr. Jensen said she was suffering some soreness and pain as a result of the pregnancy.

47.     Cpt. Gallagher then said "ooh, I'll bet her tits are getting huge, pregnant are the best, the kind you just want to cum all over." Mr. Jensen immediately stopped talking to Cpt. Gallagher at that point.

48.     Back in April 2008, Mr. Jensen was asked to give a staff presentation regarding a new reporting system.

49.     Mr. Jensen left the room for a moment after setting up the presentation, and when he returned, the phrase "YOU'RE GAY" was projected on the wall.

50.     Upon entering the room, Cpt. Gallagher began laughing immediately, and other officers soon joined in the laughing.

51.     After the presentation, Chief McGuire and Captain Cox congratulated Mr. Jensen on a good presentation, after which Cpt. Gallagher chimed in and added "yeah for a gay guy that sucks dick."

52.     During a staff meeting that month, Mr. Jensen commented in front of Lt. Shober, Sgt. Motzkus, Sgt. Rees, and Sgt. Sundquist, that "it is amazing Lt. Gallagher still has a job after he was punished for sexual harassment and then he shows me porn on his work computer."

53.     Two of the other Sergeants present said they had also been shown pornography on Lt. Gallagher's work computer.

54.     Lt. Shober did nothing about these comments.

55.     In another staff meeting in September 2008, other Sergeants brought up the fact the Cpt. Gallagher had shown them a clip of gay pornography on his work computer.

56.     In fact, Cpt. Gallagher has showed pornographic material to several officers on numerous occasions, including:

a.     August 2000: Lt. Gallagher routinely called officers into his officers saying they needed to see something, where he   showed them a homemade video of a suspect and young males engaging in anal sex with dildos. The tape was part of evidence, but Lt. Gallagher showed it to others and laughed about it.

b.     August 2001: Lt. Gallagher called Mr. Jensen into his office and showed him a video called "soft serve" which depicted one person "taking a crap into the mouth of another person." Mr. Jensen almost vomited upon seeing the clip, and Lt. Gallagher just laughed.

c.     In 2002, Lt. Gallagher asked Mr. Jensen to go with him out of the office saying "you gotta see this." He took Mr. Jensen to an apartment complex in the city where, after entering the apartment, the tenant put in a video of the tenant's ex-boyfriend having sex with a different female. Lt. Gallagher made crude comments during the video, telling Mr. Jensen that Mr. Jensen wished he was with the man from the video.

d.     In March 2007, Lt. Gallagher called Mr. Jensen into his office and told him there was new software that could show someone's location based on their cell phone. Mr. Jensen gave him his wife's phone number and then the map zoomed in until it was showing two men engaging in anal sex. Gallagher just laughed and said that it was Mr. Jensen and another officer in the video.

57.     Lt. Gallagher hit Mr. Jensen in the genitals in passing on numerous occasions during Mr. Jensen's employment over the course of 12 years, the most recent occurring in September 2008.

58.     The Chief of Police of West Jordan City was present on several occasions to witness Lt. Gallagher's inappropriate and offensive harassment of Mr. Jensen.

59.     After a ten-plus year period, with Mr. Jensen reporting several of the incidents to his superior, Lt. Shober, nothing was done about the sexual harassment.

60.     In addition to the sexual harassment, Lt. Gallagher has verbally abused and embarrassed Mr. Jensen on several occasions, namely:

    a.      In March 2001, Lt. Gallagher accused Mr. Jensen of stealing a flashlight. Lt. Gallagher yelled at Mr. Jensen for several minutes to the point Mr. Jensen was in tears over the situation. Lt. Gallagher threatened that if "you're going to fuck with me, I'll move you out of this position so fast you won't know what happened." It turned out that another officer had placed the flashlight in the wrong office by mistake.

    b.      Lt. Gallagher threatened Mr. Jensen in or about July 2001 that he needed to file a complaint against another officer. Lt. Gallagher stated that some officers were going places in the department, namely himself, Shober, and Motzkus to name a few, and that other officers were not. Mr. Jensen was told that if he wanted to be part of the successful group, he had to file a complaint against another officer. Mr. Jensen found out the things Lt. Gallagher accused the officer of were not true and refused to file the complaint. Mr. Jensen then was

told by Lt. Gallagher that Mr. Jensen would not be moved to a D.E.A.

position, and upon information and belief, this was because Mr. Jensen

refused to file the complaint.

c.  After this incident, Mr. Jensen told Lt. Shober about what occurred, and a few

weeks later, Lt. Shober informed Mr. Jensen that there was an error and Mr.

Jensen was getting the D.E.A. position.

d.  On other occasions, other officers claimed they would stay away from Lt.

Gallagher because they were afraid he would retaliate.

e.  In March 2008, Lt. Gallagher and Lt. Shober approved a transfer of DUI's.

However, approximately one week later, Lt. Gallagher confronted Mr. Jensen

about the transfers, wanting to know why they were changed. When Mr.

Jensen informed Lt. Gallagher that he had approved the transfer, Lt. Gallagher

was furious. He told Mr. Jensen "you want to fuck with me, I can ruin your

career." He also stated "you need to remember who you are" followed by

"you don't tell me what I said, I tell you, you're career is done, got that, you

used my name on something and that is bull-shit, we'll see who wins this

battle when your life is miserable."

f.  On several occasions after this incident, Cpt. Gallagher walked by Mr.

Jensen's office, flipped him off while saying "fuck you Jensen", then walked

away.

61.    Numerous other incidents occurred in which Lt. Gallagher threatened and harassed Mr. Jensen, all with nothing being done to supervise or prevent Lt. Gallagher from engaging in this behavior again.

62.    Mr. Jensen had several negative health effects as a result of Lt. Gallagher's abuse.

63.    Mr. Jensen suffered the following health problems during his time with West Jordan City:

    a.    In 1998, Mr. Jensen visited the hospital after he thought he was having a heart attack. None of the treatments he received seemed to work. He lived in pain for three years until, in 2001; he was diagnosed with acute anxiety. The anxiety caused Mr. Jensen to have panic attacks which caused pain and shortness in breathing.

    b.    In 2002, Mr. Jensen was diagnosed with depression as a result of stress and anxiety. Mr. Jensen has been on six different medications since then, including Xanax, Paxil, Zoloft, Klonopin, Ambien, and Cymbalta.

    c.    After coming to manage the panic attacks and depression, Mr. Jensen was placed under Lt. Gallagher again in 2006. Since then, the panic attacks and depression increased to the point Mr. Jensen was seeing a doctor once every three months for treatment.

64.    In terms of employment promotions, in January 2004, Mr. Jensen finished tied for first in the testing for Sergeant positions.

65.    Never had anyone in first place not been promoted.

66.     Yet, both Mr. Jensen and the other officer tied with him were passed up, and the officer who finished third was promoted.

67.     Upon information and belief, Lt. Gallagher spoke with the Chief of Police on several occasions about the decision, and with his record of harassing Mr. Jensen, it is believed that Lt. Gallagher convinced the Chief of Police to deny the promotion to Mr. Jensen despite his first place testing.

68.     After over 12 years of this work environment, in December 2008, Mr. Jensen filed a labor complaint with the State of Utah Labor Commission, which detailed the abuse and sought vindication of his rights.

69.     In settlement of his claims, he was paid $80,000.00 upon the conditions that he resign from the West Jordan Police Department and withdraw his state labor claims.

70.     West Jordan City agreed not to retaliate against Mr. Jensen for having exercised his right to file charges of employment discrimination.

71.     West Jordan City agreed to continue to abide by the Utah Anti-Discrimination Act of 1965, the Americans with Disabilities Act of 1990, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, and Title 29 of the Code of Federal Regulations part 1614.

72.     The settlement agreement was memorialized on April 29, 2009.

73.     Subsequent to the settlement agreement, on May 7, 2010 Mr. Jensen was arrested by an investigator for the Salt Lake District Attorney's Office.

74.     Mr. Jensen was charged with three felonies, a second-degree felony Possession with Intent to Distribute a Controlled Substance, and two third-degree felonies of Misuse of Public Monies.

75.     Mr. Jensen's employer at the time fired him on account of the charges.

76.     After reviewing the discovery information, Mr. Jensen noticed the West Jordan City investigation against him began the day he entered the settlement agreement in April 2009, which included investigation of the possession charge and one of the misuse charges. The other misuse charge was under investigation as of 2008.

77.     From April 2009 to August 2009, West Jordan City handled the investigation against Mr. Jensen.

78.     The individual spearheading the investigation was Lt. Shober, one of the named individuals in Mr. Jensen's labor and sexual harassment complaint.

79.     Lt. Shober's ordinary assignments did not include investigative work.

80.     Lt. Shober conducted several interviews and other forms of investigation during this time.

81.     In August 2009, the investigation was turned over to the Salt Lake District Attorney's Office ("DA's Office"), but a West Jordan City lieutenant continued to sit in on approximately 13-18 witness interviews in the investigation.

82.     This is unusual for a lieutenant (and anyone in the city for that matter) to assist in interviewing witnesses on a case that had been assigned to another agency.

83.     There were many charges referred to the DA's Office, with all but the three previously-mentioned charges being rejected for filing.

84. For example, West Jordan City referred the following charges to the DA's Office, which were rejected because there was no evidence to support the claims:

      a.      Soliciting a Prostitute; and

      b.      Altered Police Reports;

85. West Jordan City began to internally transcribe the witness interviews that had taken place during the investigation.

86. Transcribing interviews is not an ordinary function of law enforcement. This was done prior to Mr. Jensen filing his labor complaint.

87. When West Jordan City referred the investigation and case to the DA's Office, the City failed to provide many important and determinative pieces of information.

88. West Jordan City failed to disclose Mr. Jensen's previous sexual harassment claim which settled for $80,000.00.

89. West Jordan City failed to disclose the following known information to the DA's Office regarding the first count of Misuse of Public Monies:

      a.      The money alleged had been illegally seized by a Mr. Bigelow.

      b.      The money was not properly secured at the Salt Lake County Jail.

      c.      Mr. Bigelow failed to provide Mr. Fallahi (party to the case) with an asset forfeiture form as required by policy and state law.

      d.      The money was released to Mr. Bigelow by someone from the Salt Lake County Jail although the person who initialed the form releasing the money to Mr. Bigelow denied doing such.

e.   Mr. Bigelow failed to follow policy and state law by not recording how much money was seized.

f.   Mr. Bigelow held the money for over two weeks before it was turned over to Mr. Jensen.

g.   Mr. Jensen reviewed Mr. Bigelow's report the next working day after receiving the money and immediately notified his supervisor Lt. Shober that the money was illegally seized and that there had been no factual nexus established between the money taken and any drug activity.

h.   West Jordan has an ethical and legal obligation not to seize money without first establishing this nexus.

i.   Officer David Kwant was being investigated for crashing his DEA-issued vehicle while under the influence of a controlled substance and for taking seizure money from a case he worked on for the DEA.

j.   During Officer Kwant's investigation, Officer Kwant admitted to Mr. Jensen that he had taken money but it was different money than what the DEA believed he had taken.

k.   Mr. Jensen had passed this confession to his superior Lt. Shober and to Mr. Cox (an employee of West Jordan City).

l.   In recorded conversations with Mr. Cox, Mr. Jensen informed Mr. Cox what Mr. Jensen had done with the Fallahi seizure money, where they could find the receipt for the transaction with Mr. Fallahi's attorney, and also a reminder

that Officer Kwant admitted to taking money and this could be the reason why the Fallahi money was missing.

m.   Also, in recorded conversations with Mr. Cox, Mr. Jensen offered to take a polygraph.

n.   None of these recorded conversations were delivered to the DA's Office.

o.   The timesheets for Mr. Jensen and Mr. Bigelow show that the two were not working at the same time when Mr. Bigelow claimed he turned the money over to Mr. Jensen.

p.   All funds in Mr. Jensen's safe were properly accounted for, such as funds commonly referred to as "buy money" or "chit money."

q.   Mr. Jensen's safe combination had not been changed when Mr. Jensen assumed the safe.

r.   The safe was accessed by other members of the unit when Mr. Jensen was not available.

90.   West Jordan City failed to disclose the following known information to the DA's Office regarding the second Misuse of Public Monies and the Drug Distribution charges:

a.   Mr. Shober, who was leading the investigation, was a named individual in Mr. Jensen's previous sexual harassment complaint.

b.   Mr. Jensen had no access to his office from October 2008 to April 2009 when he was placed on paid leave to the day he was taken to the office after entering the settlement agreement.

c.     It could have been possible then, without access, and his office open to others, that Mr. Jensen did not have exclusive control over that area, leaving it open for alleged incriminating information to be planted in the office.

d.     Mr. Jensen had finalized all reports and removed all personal effects prior to leaving in October 2008 in anticipation of his paid leave.

e.     West Jordan City screened the drug distribution charge based on statements from two admitted drug addicts/dealers. No other corroborating information was given to the DA's Office.

f.     West Jordan City failed to follow protocol and quantum of evidence standards in screening the drug charge when the city provided no corroborating information through time frame, video, audio, etc.

g.     West Jordan City failed to follow protocol and quantum of evidence standards in screening the drug charge when no "nik-kit" test was done, no state crime lab report was prepared, no expert witness information was given, and no drugs, packaging or other paraphernalia was discovered to corroborate the statements of the time and place of the offense.

h.     Usually, the City does not investigate offenses occurring this long ago unless another crime like murder is involved in order to preserve its resources.

i.     There were other officers present during incidents discussed by the addict/dealer "informants" namely, Sgt. Motzkus, Burdette Shumway, and Bigelow.

91.     In December 2010, Mr. Jensen was up for promotion at his new job in a guitar store when his employer called West Jordan City for a recommendation.

92.     West Jordan City falsely reported that Mr. Jensen had been fired and was a drug dealer.

93.     In December 2010, two of the three charges were dismissed by the court without prejudice after only a preliminary hearing.

94.     The final count of Misuse of Public Funds was bound over on January 6, 2011 when the judge noted that at this stage all inferences must be in favor of the state.

95.     Later, during a meeting with Mr. Jensen's attorney and Mr. Parrish and Mr. Gil of the DA's Office, Mr. Jensen's alibi witnesses were disclosed.

96.     One of the alibi witnesses caused the entire DA's Office to be conflicted out the case.

97.     The case was then transferred to the Davis County DA's Office (the "Davis Office").

98.     Mr. Rawlings of the Davis Office was given authority to screen the charges anew and determine whether he wanted to move forward or not.

99.     During this review period, the Davis Office was repeatedly contacted by members of the civil division of West Jordan City.

100.    Mr. Rawlings refused to speak with them regarding the case.

101.    On May 25, 2011, Mr. Rawlings dismissed the remaining felony charge without prejudice.

102.     Prior to doing so, Mr. Rawlings informed Mr. Gil of the Salt Lake DA's Office of his pending decision, and requested the Mr. Gil investigate the West Jordan Police Department for retaliation.

103.     Recently, Mr. Rawlings authored a letter for Mr. Jensen informing state authorities that Mr. Rawlings would not refile any of the three charges against Mr. Jensen despite them being dismissed without prejudice.

104.     Mr. Rawlings also indicated in the letter that the case was no longer under investigation and that he supported expungement of all records related to the felonies.

105.     Finally, Mr. Rawlings wrote that he believed that West Jordan City brought the charges for retaliatory reasons.

106.     Even after charges were dismissed, in November 2011, Mr. Jensen received a job with Silencer Code but was informed he would not be permitted to work at a higher grade because Silencer Code received information from West Jordan City that Mr. Jensen was a drug dealer and a thief.

107.     Since dismissal of the charges, P.O.S.T. has begun its investigation into the criminal charges and complaints from West Jordan City.

108.     The P.O.S.T. matter has prevented Mr. Jensen from obtaining any position as a police officer.

109.     West Jordan City failed to disclose the same information cited above to the P.O.S.T. investigation.

## FIRST CAUSE OF ACTION
(Title VII Retaliation Claim)

110.    All the previous allegations contained in the above paragraphs are incorporated and re-alleged herein by reference.

111.    Mr. Jensen exercised his protected rights under Title VII and the Utah Anti-Discrimination Act in filing his labor and sexual harassment complaint in December 2008.

112.    This complaint was filed in protection of his rights against discrimination and qualifies as a proceeding arising out of discrimination.

113.    Subsequent to the settlement of his discrimination complaint in April 2009 Mr. Jensen encountered adverse activity from West Jordan City.

114.    The day he settled his labor claims an investigation began against Mr. Jensen involving felony criminal charges.

115.    West Jordan City claimed Mr. Jensen solicited a prostitute and sent the claim to the Salt Lake DA's Office.

116.    West Jordan City claimed Mr. Jensen altered police reports and sent the claim to the DA's Office.

117.    Both of the above mentioned claims were rejected by the DA's Office as it found no evidence to support either claim.

118.    West Jordan City omitted material and exonerating information it knew prior to and discovered during its investigation regarding felony claims against Mr. Jensen.

119.    West Jordan City failed to inform the DA's Office of information and lack of evidence in the claims it sent to the DA's Office regarding Misuse of Public Monies and Drug Distribution.

120.     West Jordan City omitted the same material and exonerating information to the P.O.S.T. investigation.

121.     Mr. Rawlings of the Davis Office authored a letter stating he believed all these charges were brought in retaliation.

122.     West Jordan City continuously told Mr. Jensen's subsequent employers that Mr. Jensen was a thief and a drug dealer, and that he was fired, when he personally resigned.

123.     The timing of West Jordan City's investigation and Mr. Jensen's resignation over discrimination matters creates a causal connection between the adverse behavior of West Jordan City and Mr. Jensen's proceeding arising out of discrimination.

124.     The causal connection is enhanced by West Jordan City's repeated lies about Mr. Jensen's employment resignation and false charges of drug dealing.

125.     Finally, Cpt. Gallagher's threats to ruin Mr. Jensen's career for including him in the sexual harassment complaint establish a prima facie case of the causal connection between the adverse action taken by West Jordan City subsequent to Mr. Jensen's proceeding and settlement arising out of discrimination.

126.     Accordingly, Mr. Jensen is entitled to damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
(42 U.S.C. § 1983 Civil Rights Action, Retaliation)

127.     All the previous allegations contained in the above paragraphs are incorporated and re-alleged herein by reference.

128.     Mr. Jensen engaged in a protected activity when he filed his sexual harassment and labor complaint in December 2008.

129.   Mr. Jensen named Gallagher and Shober personally in the complaint.

130.   The same day the complaint settled in April 2009, West Jordan City began investigating Mr. Jensen for various crimes, appointing Lt. Shober as the head of the investigation.

131.   West Jordan City claimed Mr. Jensen solicited a prostitute and sent the claim to the DA's Office.

132.   West Jordan City claimed Mr. Jensen altered police reports and sent the claim to the DA's Office.

133.   Both of the above mentioned claims were rejected by the DA's Office as it found no evidence to support either claim.

134.   West Jordan City omitted material and exonerating information it knew prior to and discovered during its investigation regarding felony claims against Mr. Jensen.

135.   West Jordan City failed to inform the DA's Office of information and lack of evidence in the claims it sent to the DA's Office regarding Misuse of Public Monies and Drug Distribution.

136.   West Jordan City omitted the same material and exonerating information to the P.O.S.T. investigation.

137.   West Jordan City continuously told Mr. Jensen's subsequent employers that Mr. Jensen was a thief and a drug dealer, and that he was fired, when he personally resigned.

138.   The above-mentioned retaliatory actions taken by West Jordan City would chill any person of ordinary firmness from engaging in protected activity like Mr. Jensen did.

139.    Other officers have admitted that they would not report or stand up to Captain Gallagher for fear of retaliation.

140.    Mr. Jensen has suffered in subsequent social, economic, and professional opportunities because of the retaliatory actions of West Jordan City.

Accordingly, Mr. Jensen has been harmed and is entitled to damages pursuant to 42 U.S.C. § 1983 in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
(Breach of Contract)

141.    All the previous allegations contained in the above paragraphs are incorporated and re-alleged herein by reference.

142.    In April 2009, Mr. Jensen and West Jordan City entered a settlement agreement.

143.    Under the agreement, Mr. Jensen relinquished and withdrew his labor and sexual harassment complaint against West Jordan City.

144.    Mr. Jensen also resigned from his employment with the West Jordan City Police Department.

145.    In exchange, West Jordan City paid Mr. Jensen $80,000.00.

146.    West Jordan City also promised to abide by the laws of the United States of America and the state of Utah, and by specific mention the Utah Anti-Discrimination Act of 1965, Americans with Disabilities Act of 1990, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, and Title 29 of the Code of Federal Regulations, part 1614.

147.    West Jordan City also agreed not to retaliate against Mr. Jensen for having exercised his right to file a charge of employment discrimination.

148.    West Jordan City breached this agreement through retaliation by beginning a criminal investigation against Mr. Jensen the day the settlement agreement was signed.

149.    West Jordan City breached the agreement through retaliation by claiming and pursuing baseless and non-supportable felony charges against Mr. Jensen.

150.    West Jordan City breached the agreement through retaliation by failing to inform the DA's Office of material and exonerating information regarding the claims it sent to the DA's Office.

151.    West Jordan City breached the agreement through retaliation by failing to provide any evidential support in any form regarding the claims it sent to the DA's Office, especially those of Soliciting a Prostitute, Altered Police Reports, Misuse of Public Monies, and Drug Distribution.

152.    West Jordan City breached the agreement through retaliation by falsely telling Mr. Jensen's subsequent employers that he was fired and was a drug dealer.

153.    As a result of West Jordan City's breach of the contract through retaliation Mr. Jensen has been harmed through loss of employment, loss of economic benefit, and by being forced to appear at criminal proceedings against him which had no base in law.

154.    Accordingly, Mr. Jensen is entitled to damages for breach of contract in an amount to be proven at trial.

## **FOURTH CAUSE OF ACTION**
(Negligent Infliction of Emotional Distress)

155.    All the previous allegations contained in the above paragraphs are incorporated and re-alleged herein by reference.

156.   For over a ten year period Captain Gallagher, Lt. Shober, and Does 1-10 with the West Jordan Police Department negligently involved Mr. Jensen as the center of gay jokes.

157.   The negligent behavior involved evidence from sex crimes, pornography on work computers, and took place in front of multiple officers, Mr. Jensen's family, and even the Chief of Police.

158.   This negligent behavior inflicted serious and damaging emotional distress on Mr. Jensen in the form of humiliation, degradation, embarrassment, depression, high anxiety, and an aggravating heart condition with panic attacks.

159.   Mr. Jensen's emotional distress, depression, anxiety, and health problems were caused by the continuous behavior of his superiors.

160.   Mr. Jensen's emotional distress was furthered by the lack of action despite his numerous reports and complaints of the inappropriate behavior to his superiors in the West Jordan Police Department.

161.   As a result of the negligent behavior, Mr. Jensen suffered physical harm manifested through objective symptomatology, namely in depression, loss of sleep from anxiety, high stress at work, heart problems, sever pain, and panic attacks.

162.   Under the circumstances of constant teasing and inappropriate behavior from superior officers who were never disciplined for the conduct, any reasonable person would have suffered emotional distress in a similar manner.

Accordingly, Mr. Jensen has been harmed and is entitled to damages in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
(Negligent Supervision)

163.    All the previous allegations contained in the above paragraphs are incorporated and re-alleged herein by reference.

164.    West Jordan City was negligent in placing Cpt. Gallagher and Lt. Shober in positions of trust and failed to provide adequate supervision of their activities.

165.    West Jordan City had a duty to supervise and direct Gallagher and Shober in a manner which protected persons from any acts of abuse or harassment from either Gallagher or Shober.

166.    West Jordan City knew the acts complained of in the sexual harassment and discrimination complaint were foreseeable.

167.    Several times, and upon information and belief as early as 2000, Mr. Jensen informed superiors and other officers that the teasing was inappropriate, that it was causing Mr. Jensen stress, anxiety, and fear to act because his other superiors would retaliate.

168.    Further evidence of foreseeability exists in that even the Chief of Police, Chief McGuire, made jokes about Mr. Jensen being gay.

169.    Additionally, in multiple meetings with superiors Mr. Jensen reported in front of other officers that Gallagher had tricked him into viewing pornography on Gallagher's work computer.

170.    West Jordan City did nothing as a result of Mr. Jensen's efforts to make it known to his superiors that Gallagher and Shober were engaging in these acts of abuse and harassment.

171.    Consequently, Mr. Jensen continued to suffer harassment and abuse from Gallagher and Shober despite West Jordan City being on notice of its duty to supervise and direct

these superior officers in a manner that protected Mr. Jensen and other officers from being subject to harassment and abuse.

172.    Accordingly, Mr. Jensen has been harmed by West Jordan City's negligent supervision of its duty, and Mr. Jensen is entitled to damages in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
(Intentional Interference with Economic Relations)

173.    All the previous allegations contained in the above paragraphs are incorporated and re-alleged herein by reference.

174.    West Jordan City intentionally interfered with Mr. Jensen's economic relations and potential economic relations when employers called West Jordan City for a reference check in considering Mr. Jensen for employment and West Jordan City falsely and repeatedly told employers that Mr. Jensen was fired, was a drug dealer, and/or stole public funds.

175.    Specifically, in December 2010, over a year and a half after Mr. Jensen resigned from West Jordan City through the signed settlement agreement, West Jordan City retaliated and falsely told Mr. Jensen's current employer that Mr. Jensen was a drug dealer and he had been fired from West Jordan City.

176.    Neither allegation was true, yet as a result Mr. Jensen did not receive his due promotion and was not given time off to appear in the criminal proceedings West Jordan City charged him in.

177.    Furthermore, in November 2011, after all the criminal charges were dismissed for lack of corroborating evidence, Mr. Jensen was working for Silencer Code when Silencer Code informed him that he was not permitted to work at a higher pay grade because Silencer Code

received information from someone at West Jordan City that Mr. Jensen was a drug dealer and a thief.

178.    West Jordan City interfered with Mr. Jensen's economic relations through improper means by giving false information to employers calling for reference checks.

179.    Additionally, improper means were taken in Mr. Jensen's employment with Silencer Code when the employer received information from the city. It is not known whether Silencer Code even contacted West Jordan City to request any information.

180.    As a consequence of West Jordan City's improper means through lies and breaches of the settlement agreement through retaliation, Mr. Jensen was damaged by not receiving promotions, losing employment due to baseless criminal charges, not being permitted to work at a pay grade he was otherwise deserving of, and by not being able to work as a police officer even to this day.

181.    Consequently, Mr. Jensen is entitled to damages resulting from West Jordan City's intentional interference with his economic relations in an amount to be determined at trial.

## JURY DEMAND

Plaintiff hereby makes a formal request that a jury be impaneled to receive the facts of this matter, that the jury be instructed regarding the applicable law, and that Plaintiff be allowed to present his causes of action to his peers for legal determination.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that judgment be entered against the above captioned Defendants as follows:

1.      For judgment against the above captioned Defendants in an amount to be proven at trial.

2.      Plaintiff's damages will include, but are not limited to:

    a.  All general damages in an amount of not less than one million dollars;

    b.  Special damages in an amount to be proven at trial;

    c.  Compensatory damages in an amount to be proven at trial;

    d.  Punitive damages in an amount not less than three times the multiplier of all other damages awarded;

    e.  And other such appropriate damages including:

    f.  An award of all attorney's fees and costs pursuant to 42 U.S.C. § 1988.

3.      For all other damages as deemed equitable and just by the Court.

DATED and SIGNED this 27th day of July, 2012.

HEIDEMAN, MCKAY, HEUGLY & OLSEN, L.L.C.


/s/ Justin D. Heideman_____
JUSTIN D. HEIDEMAN
*Attorney at Law*