# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

* * *

| | |
|---|---|
| AARON JENSEN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| WEST JORDAN CITY, a ) | Case No. 2:12-cv-00736 |
| Utah municipal ) | |
| corporation, DAN ) | Deposition of: |
| GALLAGHER, in his ) | |
| official capacity, ) | KEN WALLENTINE |
| ROBERT SHOBER, in ) | |
| his official ) | |
| capacity, and DOES ) | |
| 1-10, ) | |
| ) | |
| Defendants. ) | |

* * *

April 24, 2015

9:00 a.m.

West Jordan City Offices

8000 South Redwood Road

West Jordan, Utah  84088

* * *

- Linda Van Tassell, RDR/RMR/CRR -

Page 2

APPEARANCES
For the Plaintiff:   Ashley F. Leonard
                     HOLLINGSWORTH LAW OFFICE, LLC
                     1115 South 900 East
                     Salt Lake City, Utah 84105

For the Defendants:  Paul D. Dodd
                     West Jordan City Offices
                     8000 South Redwood Road
                     West Jordan, Utah  84088
                            * * *
                          INDEX
EXAMINATION                          PAGE
By Mr. Dodd                           3
By Ms. Leonard                       31
By Mr. Dodd                          51
By Ms. Leonard                       52

DepomaxMerit

Linda Van Tassell, CRR/RMR/RDR

Page 3

                  PROCEEDINGS
                KEN WALLENTINE,
called as a witness on behalf of the defendants,
being duly sworn, was examined and testified as
follows:
                  EXAMINATION
BY MR. DODD:
   Q.  Mr. Wallentine, would you please state your full name for the record.
   A.  Ken Wallentine.
   Q.  And could you give your address?  I guess you don't have to if you don't want.
   A.  No, I wouldn't.
   Q.  Okay.  Why don't we start with a little bit of just your -- you've had your deposition taken before.
   A.  I have.
   Q.  And I understand you're an attorney so you understand how these proceedings work.
   A.  Generally, yes.
   Q.  So I won't get into all the background of those things with you.  Why don't we just start with your work background.  Have you ever been a police officer?
   A.  Yes.

Page 4

   Q.  When were you POST certified?
   A.  I don't recall when I was certified as a corrections officer.  I was certified as a peace officer in 1981 or '82.
   Q.  Okay.  And where did you work in law enforcement?
   A.  I started at Brigham Young University in the campus police there.  I worked at the Provo City Jail and Provo City Police Department and have worked at a number of other agencies.
   Q.  After your police career, did you later go to law school?
   A.  During my police career I went to law school.
   Q.  Okay.  And when did you go to law school and when did you graduate?
   A.  I went to law school from 1987 to 1990. I graduated in April, I believe it was, of 1990.
   Q.  Did you begin working as an attorney after that?
   A.  I have worked as an attorney consistently since then, most often part time as an attorney.
   Q.  Okay.  What was your job immediately after graduation?

Page 5

   A.  Immediately after graduation I clerked for a law firm in Salt Lake.  I then clerked for Judge Gregory Orme of the Utah Court of Appeals and then clerked for Judge Edith Jones, the chief judge, past chief judge now of the 5th Circuit Court of Appeals.  I returned to Salt Lake City, worked for Parsons Behle & Latimer and I believe it was 1994 moved to the Uintah Basin where I worked in the county attorney's office as well as the county sheriff's office.
   Q.  Okay.  So did you work as a prosecutor when you went to Uintah County?
   A.  Yes.
   Q.  How long were you in Uintah County?
   A.  I don't recall physically how long I was there.  I believe it was until late 2001.  There came a period of time when I was commuting from the Uintah Basin into Salt Lake City for work.
   Q.  After 2001, what was your next employment?
   A.  Well, 2001 I think is about when I moved.  But prior to that I had taken a position as a bureau chief with the Utah Department of Public Safety.  I think that was in 2000.  And for a period of time I was driving back and forth from Vernal to

Page 6

1  Salt Lake City for work.
2      Q. Okay. Did you ever have a job with
3  POST?
4      A. I did. I was a bureau chief at POST.
5      Q. Okay.
6      A. Which is part of the department of
7  public safety.
8      Q. And what is POST?
9      A. POST is an acronym for Peace Officers
10 Standards and Training. It's a division of the
11 department of public safety that oversees training,
12 certification and misconduct investigations of law
13 enforcement officers in the state of Utah.
14     Q. And you were the bureau chief there?
15     A. I was the bureau chief over
16 investigations and for a period of time bureau chief
17 over in-service training.
18     Q. Okay. So as a bureau chief of
19 investigations, would you investigate allegations of
20 misconduct of a police officer?
21     A. Yes. Investigate as well as supervise a
22 staff of five or so, maybe more at some point,
23 investigators who would investigate officers accused
24 of misconduct.
25     Q. Okay. How many, ballpark figure, how

Page 7

1  many cases of misconduct do you believe you were
2  involved in the investigation process when you were
3  at POST?
4      A. Oh, my, it will be a ballpark figure.
5  Directly involved in, well over 100. I also served
6  twice as a member of POST counsel appointed by
7  Governor Leavitt first. I also was involved in many
8  cases in an adjudicative role, not investigating but
9  overseeing the result of the investigation. I would
10 say well over 100 and that's probably the closest
11 I'm going to be able to give you.
12     Q. That's fine. After your position with
13 POST, where did you go?
14     A. In 2005 I took the position as chief of
15 law enforcement for the Utah Attorney General.
16     Q. Okay. And how long were you the chief
17 of law enforcement at the Utah Attorney General's
18 office?
19     A. Until April 1, 2014.
20     Q. And while you were there at the attorney
21 general's office, did you ever become acquainted
22 with the name Aaron Jensen?
23     A. I did.
24     Q. Do you recall how that happened?
25     A. I have a vague recollection of how that

Page 8

1  happened.
2      Q. What is your recollection?
3      A. I received a phone call. I believe that
4  the phone call came from Jeff -- is it Robertson or
5  Robinson?
6      Q. Robinson.
7      A. -- Robinson and he asked whether the
8  attorney general's office would provide an
9  investigator to offer some resources to the City of
10 West Jordan in connection with a case dealing with
11 Aaron Jensen.
12     Q. Okay. And are you aware, was that case
13 an internal affairs investigation or was it a --
14 what was the nature of the investigation would be a
15 better question.
16     A. My recollection is that it was an
17 employment investigation. It was an internal
18 affairs or an internal city investigation.
19     Q. Okay. And do you recall why they were
20 seeking the AG's assistance?
21     A. I don't have a very specific
22 recollection. My understanding, my recollection is
23 that there was some suggestion that the city's
24 investigation might have been biased or might not
25 have been as thorough as one of the parties may have

Page 9

1  wished and that sort of investigation was something
2  that was routinely performed by the attorney
3  general's office on behalf of local government
4  entities and I think Mr. Robinson knew that or had
5  been told that by someone. Anyway, that was
6  something that routinely the office did and so he
7  made the phone call and made the request.
8      Q. Okay. Do you recall if there was ever
9  an issue of a possible conflict with West Jordan
10 doing their own investigation? Do you recall if
11 that was an issue?
12     A. I don't have any recollection of that
13 being part of the discussion, but again, I don't
14 have a very solid recollection of that conversation.
15     Q. Okay. After that first conversation,
16 did you ever -- do you recall if you learned at any
17 point that there was an alleged conflict with West
18 Jordan performing -- finishing the internal
19 investigation?
20     A. My sense is that there is some claim
21 that there was. Whether there was an actual
22 conflict or not, I don't know and, if I knew, I
23 don't recall that.
24     Q. Okay. Normally when the city or other
25 agency seeks the AG's help for that type of

Page 10

1  investigation, is it normally because of -- well,
2  would it be abnormal for them to have a conflict
3  that they would seek an outside agency to help them?
4       A.  No.  That was for -- the attorney
5  general's investigation division is a very common
6  vehicle to become involved in a local agency
7  investigation.  It was not at all out of the normal.
8       Q.  Okay.  After that phone call, did you
9  have -- do you recall a meeting with anyone from
10 West Jordan?
11      A.  Yes.
12      Q.  And you know what, I should probably ask
13 you this before we move on.  The phone call -- I
14 know you're going to have to give a ballpark but do
15 you have any idea what time period that was?
16      A.  I struggled -- when I got the notice to
17 come here for a deposition, I really had to plumb my
18 memory as to who Aaron Jensen was and what it was
19 about.  I later remembered very generally what it
20 was about but I cannot -- I don't even remember the
21 year.  It's been -- it has been several years.
22 That's the best I can tell you.
23      Q.  I'm going to show you something just to
24 help you with your recollection.  I know obviously
25 with the amount of investigations you have

Page 11

1  participated in, I'm sure this one didn't stick out
2  to you and there's no reason why you would have a
3  special memory of it so --
4       A.  That's actually accurate.  This is one
5  that does not.  It doesn't have facts that stuck in
6  my mind.
7       Q.  That's fine.  And that's definitely
8  understandable, so I'm going to show you a document
9  that is already an exhibit in a prior deposition.
10      A.  Okay.
11      Q.  You know who Cord Skinner is, correct?
12      A.  I do.
13      Q.  Who is Cord?
14      A.  Cord, I believe he's still an
15 investigator at the attorney general's office but I
16 know Cord because I hired him and he worked for me
17 in the -- I believe at the time he was assigned to a
18 special investigations unit of the attorney
19 general's office.
20      Q.  Cord has given a deposition in this case
21 and an exhibit in his case, Exhibit No. 9, is the
22 report that he performed on the Aaron Jensen case.
23 In this report there might be some information that
24 at least would help you get an idea of when the time
25 period was.  Would you mind just kind of skimming

Page 12

1  through it and looking at some dates.
2       A.  The first thing I see is 2008.  I
3  probably would have pegged this in 2007, but I have
4  no reason to believe that it was not in 2008 that I
5  heard about this.
6       Q.  Okay.  Did your meeting at the City of
7  West Jordan happen close in time to the initial
8  phone call with Jeff Robinson?  Your recollection.
9       A.  It would have been relatively close,
10 within a few weeks.
11      Q.  Okay.  Is it possible that it could have
12 even been within a few days?
13      A.  If I was not out of town, this is the
14 sort of thing that I would have handled fairly
15 quickly and that's how I typically would handle it
16 is decided whose caseload could take an
17 investigation, assign an investigator, set up a
18 meeting and basically I would make some
19 introductions and hand off the investigation.  So if
20 it happened within a couple of days, that would make
21 sense but certainly was not more than a couple of
22 weeks.
23      Q.  Okay.  And do you recall where that
24 meeting took place?
25      A.  I do.  It was here in this building.

Page 13

1       Q.  Okay.  And do you recall who was present
2  at that meeting?
3       A.  The city attorney, Jeff Robinson, was
4  present, I was present, Cord Skinner was there, and
5  a man that I think was acting city attorney.  I knew
6  him --
7       Q.  You mean city manager?
8       A.  Or city manager, sorry, acting city
9  manager.  I knew him as the fire chief, Brad Wardle.
10      Q.  Okay.  Did Cord come because you had
11 already assigned him to be the person to investigate
12 on this case?
13      A.  Yes.
14      Q.  Okay.  And who made the decision to
15 assign Cord to the case?
16      A.  I don't recall.  Typically I would just
17 take a look at an individual investigator's caseload
18 in a unit and consult with a supervisor of that unit
19 and just -- I probably made that decision but I
20 don't recall.  I certainly ratified it.
21      Q.  Okay.  And at the meeting that you had
22 with Jeff Robinson, Cord Skinner and Brad Wardle, do
23 you recall -- I know you're not going to recall the
24 specifics.  Do you recall any of the topics that
25 were discussed that day?

Page 14

A. I recall a fairly brief description of the nature of what it was that West Jordan was asking. I believe that Jeff Robison was primarily the spokesperson. I recall telling Mr. Wardle and Mr. Robinson a little bit about Cord Skinner and why I assigned Cord Skinner to the case and that's really about all I remember. I don't remember it being a long, drawn-out meeting.

Q. Okay. Why don't we look again at Cord Skinner's report that's Exhibit 9 to his deposition, and he has an investigative summary. Could you just kind of read over that for a moment and see if that -- just read over it for a moment.

A. I've now looked at that and it refreshes my memory.

Q. As far as -- I know you said it was discussed kind of what the city wanted to be looked at. Does that help you recall specifically what the city wanted the AG to look into?

A. It does, particularly item 3, the issue of not completing reports. I recall that -- whether it was that meeting or by another means, I recall that there were a lot of reports. I recall thinking that it was appropriate for Cord for some unique talents he had.

Page 15

I remember that there were a number of cases that he would have to review related to improperly completed reports and improperly closed-out reports as well as allegations that reports had been -- that there were inaccurate statements in reports.

I do not -- and I remember something about the statistics. I don't remember anything about being a ghost sergeant. I don't remember that being discussed.

Q. And do you recall the city -- were they requesting for a criminal investigation into Aaron Jensen at that time?

A. No.

Q. Okay. And do you recall any statements made by you or by Cord in that meeting in regards to the process or the procedures if possible criminal activity is discovered in their IA?

A. It wouldn't have been Cord. It would have been me.

Q. Okay.

A. Although I don't remember the specifics of this meeting, I have had a number of meetings similar to that, both before this and after, with mayors, county commissioners, city attorneys, police

Page 16

chiefs, city administrators, and I had a pretty -- I wouldn't say it was a standard speech but there were certain elements of a meeting like this that I would try to take some measure of control and I would communicate, here's how we do business.

I would introduce the investigator, introduce Cord Skinner, tell them why I'd assigned Cord Skinner. That Cord was very familiar with the mechanics of policing. That he was one of my best investigators for complicated, long-term investigations. I doubt that I told them about his caseload. I may have. I don't know.

I would explain that once the investigation began, that it was a one-way street of communication. That Mr. Robinson and Mr. Wardle were involved. They were welcome to talk to Cord and talk to me but that we would not keep them -- that we wouldn't be giving them progress reports. They needed to understand that by turning something over to us, it became our investigation, our work product and that our staff would decide how the investigation would proceed until we were to the point of a conclusion.

I also gave them a caution, because by this time I'd had experience in one, maybe two other

Page 17

cases where someone asked us to look at something that they felt was administrative in nature and so I made a comment to the effect that we start down the street, you don't get to decide what happens if we get at the intersection of administrative and criminal.

If we find -- you can deal with the administrative stuff but if we find misconduct that arises to one of two levels, we will pursue it and you don't get to tell us no. And those two levels I would have specified. If we find something that the statute requires or suggests that we should report to Police Officer Standards and Training, we will, and then they can choose to take their own investigation or not. But we'll report it to them. We'll let you know, but we won't ask.

And, if we find criminal conduct, we will either -- typically a case like this would have gone to -- we would have taken it to the presiding district or county attorney in a jurisdiction so it would have gone to the Salt Lake County District Attorney's Office.

I remember saying something like that but that wasn't out of the ordinary. I mean, every one of the meetings that I had with government

Page 18

1  officials in similar situations but in different
2  jurisdictions I basically laid out all those steps.
3  Here's the investigator. Here's what we do. We
4  take information. We don't provide it back to you
5  until we're all done. We get to make the choices as
6  to the consequence of what we find.
7         Then I probably -- typically I would
8  say, "If that's not acceptable to you, that's fine,
9  but then we're not offering any services." I don't
10 remember the specific words, sir, but that's pretty
11 much it.
12    Q. Appreciate it. Why is it that you would
13 tell the agencies or the people that they don't have
14 control or decision if there is possible criminal
15 conduct found? You mentioned those two
16 incidences -- that you give a report to POST if it's
17 record or to the DA. Why is it that you would feel
18 the need to inform them that that wasn't in their
19 control, that that was beyond their control if that
20 was discovered?
21    A. Well, for a couple of reasons. I had
22 had experiences in the past where a senior
23 government official, upon learning that the
24 investigation wasn't going the direction he thought
25 it would, wanted the investigation stopped.

Page 19

1          I mean, I don't want it to sound to you
2  as if this was a chest-thumping exercise. I just
3  wanted everybody to understand that, by experience,
4  we'd just learned this was the best way to do it.
5     Q. Upfront.
6     A. Upfront. Just let everybody know
7  upfront. If you're okay with that, great. If not,
8  fine, we'll walk away.
9          And also because the attorney general's
10 office, the investigation division of the attorney
11 general's office, by statute, is an investigative
12 agency with statewide law enforcement authority and
13 there's both an obligation under the law as well as
14 an ethical obligation for law enforcement officers
15 that if evidence of a crime is discovered such that
16 the investigating officer believes that there's
17 probable cause basis to believe that a crime has
18 been committed and the person that committed can be
19 identified, both under policy and ethical standards,
20 an officer, including our own, would approach a
21 prosecutor to screen the case for criminal charges.
22 That was not -- if you're getting at saying that was
23 unique to this situation, it simply was not.
24    Q. Okay. If an officer had discovered
25 information like you stated that he felt there was

Page 20

1  probable cause that a crime had been committed, he
2  could identify the person who committed the crime,
3  if they chose to not report it or chose to try to
4  ignore it, is it possible that person could be
5  charged with a crime?
6     A. I would discipline that person
7  vigorously if that person worked for me.
8     Q. Did the AG's office in their
9  investigation or I guess Cord Skinner in his
10 investigation, are you aware that he ever found any
11 conduct that he thought might be criminal conduct by
12 Aaron Jensen?
13    A. He did.
14    Q. Would that have been his decision or a
15 joint decision between you and him to -- did he
16 report those issues to you?
17    A. He did.
18    Q. And what was the common -- and I think
19 you kind of hinted at this before but let me get a
20 little more particular. When that was reported to
21 you, what was the common practice for the AG's
22 office? When there was possible criminal
23 misconduct, what was the common practice or
24 procedure on how to proceed after that point?
25    A. If the alleged criminal conduct did not

Page 21

1  cross county lines, significantly cross county
2  lines -- that is, if there was not an allegation
3  that criminal events occurred in multiple counties,
4  not just someone might live in a different county,
5  and if the subject matter was not a subject matter
6  that was within the exclusive or near exclusive
7  province of the attorney general's office -- for
8  example, when we investigate officers accused of
9  being involved in child pornography, we have
10 specialized prosecutors and specialized prosecutors
11 for a few other areas, then typically the
12 investigator would go to the local prosecutorial
13 authority in Salt Lake County and the district
14 attorney's office, in the other 28 counties it would
15 be the county attorney's office and make a screening
16 appointment just like any other investigator in that
17 particular county and present the investigation
18 without any further involvement from me or from
19 anybody in our office.
20    Q. Are you aware that's what happened in
21 this case?
22    A. I believe so. I believe I recall Agent
23 Skinner telling me he thought that he had something
24 that needed to be screened. And it wasn't so much
25 asking, as notifying me because I was his chief, as

Page 22

1  a matter of courtesy that he was going to go screen
2  it with -- I don't know that I ever knew but
3  somebody at the district attorney's office.
4      Q.  And would he have done that shortly
5  after the completion of his investigation?
6      A.  That would be the typical process.
7      Q.  Do you recall when or approximately when
8  he finished his investigation?
9      A.  I don't.
10     Q.  These reports are normally given right
11 at the end of the investigation; is that correct?
12     A.  Typically when the investigation is
13 concluded his supervisor or myself would approve the
14 report and that's typically the time that it would
15 be taken for screening.
16     Q.  Okay.  The report date, what was the
17 report date that Cord Skinner drafted his
18 investigative summary?
19     A.  February 23, 2009.
20     Q.  And you don't have any information that
21 would lead you to believe that's not --
22     A.  That's about the right timeframe but I
23 have no recollection of the precise date.
24     Q.  Okay.  But would it have been normal for
25 a meeting with the DA to be somewhere close to that

Page 23

1  time period?
2      A.  Typically.  I don't even remember who
3  was district attorney at the time.  There have been
4  times when it's been easy to get into the DA's
5  office for a screening.  There's times that, unless
6  somebody's in custody, you take a number and wait
7  for a while, but it would have been in the general
8  timeframe.  I would not have been involved in
9  setting that up, so I don't know.
10     Q.  Okay.  So the district attorney at the
11 time, to my understanding, was Laura Miller.  Do you
12 know her?
13     A.  I do.
14     Q.  How do you know her?
15     A.  Her husband -- I think it's her former
16 husband now -- wrote a paper about caves being
17 eligible for designation as federal wilderness
18 areas, an area of some interest to me, and I edited
19 the paper years ago and got to know him casually
20 through that and so I knew his wife ever so casually
21 in that context.  And then I would have been in
22 various meetings with her during the tenure she held
23 as district attorney.
24     Q.  Okay.  But you don't recall calling her
25 and giving her this case or telling her Cord was

Page 24

1  going to come to present the case or anything like
2  that.
3      A.  I'm pretty sure I didn't.
4      Q.  And normally you wouldn't have been
5  involved in the case going to the district attorney;
6  is that correct?
7      A.  No.  That is correct.  If the
8  investigator felt that there was probable cause to
9  believe that a crime was committed and probable
10 cause to believe they could identify the person who
11 committed the crime, the investigator had the
12 authority to set up a screening appointment and
13 would be responsible for setting the screening and
14 going to -- at the time I think they were just doing
15 in-person screens -- going to the screening meeting
16     Q.  Okay.  Do you recall during Cord's
17 investigation, was it normal practice or procedure
18 to have someone from the local agency provide a
19 contact person or someone for investigator to be
20 able to contact to get information?
21     A.  That was routine and that typically
22 would be someone assigned at the first meeting with
23 me and the city manager or the county commissioner,
24 the sheriff or whomever.  Typically that would be
25 someone in a command position because we would want

Page 25

1  to get access to the agency's files and records so
2  we need somebody that had the authority to do that.
3      Q.  Okay.  Do you know a Captain Gary Cox?
4      A.  I do.
5      Q.  Do you recall, was he the person that
6  was assigned that role in Cord Skinner's
7  investigation?
8      A.  I don't remember.
9      Q.  That's fine.  That's something Cord
10 would better testify to?
11     A.  Yeah.  I wouldn't have had -- I've known
12 Gary Cox for a long time but I wouldn't have had
13 any -- I typically would not and did not in this
14 case have any dealings at that level once the
15 investigation started.  That would have been the
16 investigator's duty.
17     Q.  But that is normal to have someone in
18 that role in the local agency to assist the
19 investigator from the attorney general's office.
20     A.  The rule, the typical operation would be
21 the command level person at the agency would be
22 designated and would be the go-to person who -- they
23 may not even be told why but that's someone that
24 Cord could go to, whether it was Captain Cox or
25 someone else.  Cord could say, "I need this span of

April 24, 2015                                              Jensen v. West Jordan City
                                                                        Ken Wallentine

Page 26

1  records or I need access to this officer. Please
2  set it up.":
3      Q.  Okay.  To your knowledge, did West
4  Jordan ever try to do anything to influence change
5  or have any effect on the investigation of the
6  attorney general's office?
7      A.  No.
8      Q.  Did they ever try to put pressure on the
9  attorney general's office to contest certain
10 outcome?
11     A.  No.
12     Q.  What would have been your reaction if
13 somebody had attempted to do any of those things?
14     A.  They would have been loudly, vigorously
15 and aggressively rebuffed.
16     Q.  Did you ever hear Cord Skinner report to
17 you that someone tried to influence him personally
18 or tried to do anything to determine the outcome of
19 the case to him personally?
20     A.  No.  And by this point in Cord's career
21 he had worked for me long enough that he, I'm
22 certain, knew how I would respond to something like
23 that.  I prized our agency's independence and held
24 that to be of significant value and my staff knew
25 that.

Page 27

1      Q.  Okay.  And was it normal for Cord to
2  periodically give a report, whether it's just
3  telephonically or in person, of the progress of the
4  investigations he was working on?
5      A.  Yes.  Not in any great detail.
6      Q.  Okay.  Did you ever discuss -- and you
7  might not recall, but do you recall ever discussing
8  with Cord the decision to turn things over to the
9  Salt Lake County District Attorney's Office?
10     A.  As I mentioned, it would be typical for
11 him to just give me a courtesy notification.  You
12 know, I did ask my staff, not just in this context,
13 but any context, that if they were going to have
14 significant contact from an outside agency, that
15 they just let me know.  So I'm pretty sure he'd let
16 me know but I don't recall any substantive
17 discussion.  Certainly he would not need to ask my
18 permission to clear it with me.
19     Q.  Okay.  Do you recall -- and you might
20 not.  Do you recall ever reviewing any of the
21 evidence to see if you believed there was sufficient
22 evidence for him to do that or did you leave that up
23 to him?
24     A.  I did not.  Among the reasons Cord was
25 assigned to this case is that I had a lot of

Page 28

1  confidence in his ability to make those kind of
2  determinations.
3      Q.  Okay.
4      A.  Had then; still do.
5      Q.  From what you've seen in the report and
6  what you know about that investigation and reporting
7  it to the DA, was there anything unusual or
8  different or strange about this case than a normal
9  case the AG handles?
10     A.  No.  There have been a number of cases
11 throughout the state but also here in Salt Lake
12 County where we've investigated, found evidence of a
13 crime, often evidence that wasn't known to the
14 agency, took it to the district attorney's office
15 and prosecuted police officers.
16     Q.  Okay.  No one asked West Jordan City's
17 permission or anything to take it to the DA; is that
18 correct?
19     A.  No.  I mean no, we did not.  That's not
20 again -- first they would have been told that's not
21 something they get to decide.
22     Q.  Okay.  Were you aware that Laura Miller
23 had previously been an employee of West Jordan?
24     A.  I was not aware then and, if you're
25 telling me that now, that's news to me.

Page 29

1      Q.  Okay.  But, if you had known, that
2  wouldn't have affected your decision or the
3  investigation on how it proceeded by the AG's
4  office; is that correct?
5      A.  That's correct.
6      Q.  Do you know Judge Paul Parker?
7      A.  I do.
8      Q.  Do you know Robert Parrish?
9      A.  Yes.
10     Q.  Are you aware -- I should have asked you
11 this first.  Do you know who at the Salt Lake County
12 District Attorney's Office met with Cord and took
13 over that investigation?
14     A.  I don't.
15     Q.  Okay.  Do you believe Paul Parker is a
16 competent and intelligent prosecutor, that he had
17 the ability to understand his role as a prosecutor
18 and to fulfill those roles?
19     A.  Well, he was.  He's now a judge but --
20     Q.  At the time he was a prosecutor did you
21 feel he was?
22     A.  I did.  I've known Judge Parker for many
23 years.  He's a former Uintah Basin resident and I
24 had then and still have respect for his professional
25 capabilities.

8 (Pages 26 to 29)

Page 30

1  Q. And Robert Parrish, do you believe that
2  he -- and I believe he is still a prosecutor at the
3  DA's office. Do you believe that he is a competent
4  prosecutor and understands the process and how --
5  what's your opinion of Robert Parrish?
6  A. I knew Mr. Parrish through some child
7  abuse prosecutions. I did not know he was with the
8  district attorney's office but, in my dealings, I
9  always found him to be very competent and very
10 professional.
11 Q. Were you ever aware that Aaron Jensen
12 had filed a sexual harassment claim against some of
13 his superiors in the West Jordan Police Department?
14 A. I heard that at some point. I don't
15 know at what point I heard that.
16 Q. Do you believe it was during the
17 investigation or after?
18 A. I don't know.
19 Q. With that information, if you were aware
20 of it during the investigation or not aware of it
21 during the investigation, would that information
22 change the way the investigation is performed?
23 A. No.
24 Q. Why not?
25 A. It would not be uncommon -- the kind of

Page 31

1  cases that the attorney general's office would be
2  asked to look at by a local entity more often than
3  not involved some difficulty, some thorniness, some
4  allegation of bias or nepotism or prejudice and
5  we didn't really get the routine cases. Because of
6  that, our investigators always had to be very
7  sensitive to understanding that there were emotions
8  and biases at work.
9       I would have expected if Cord Skinner
10 had been told that, I would have expected that he
11 would have, while being aware of it, he would have
12 been just as thorough in his investigative process
13 as if he hadn't been aware of it.
14      MR. DODD: I don't think I have any
15 other questions for you today.
16      THE WITNESS: All right. Do you have
17 any questions?
18      MS. LEONARD: I do.
19      THE WITNESS: We're going to take a
20 break.
21      (Recess.)
22           EXAMINATION
23 BY MS. LEONARD:
24 Q. I'm Ashley Leonard. I'm one of Aaron
25 Jensen's attorney. The firm is Hollingsworth Law

Page 32

1  Office. We're in Salt Lake City.
2  A. Nice to meet you.
3  Q. You too. Do you know Aaron Jensen.
4  A. I do not.
5  Q. You've never met him?
6  A. No.
7  Q. Have you ever seen Aaron on the news?
8  A. No.
9  Q. And you were the chief of special
10 investigations unit for the AG's office; is that
11 right?
12 A. No. I was the chief law enforcement.
13 The special investigations chief would have worked
14 for me.
15 Q. Okay. And you were in that position for
16 over ten years?
17 A. Nine.
18 Q. Until April 2014?
19 A. Correct.
20 Q. And did you retire?
21 A. I did.
22 Q. Okay.
23 A. You should make that your goal, to
24 retire on April Fool's Day. When you're at the
25 party tell everybody you're kidding.

Page 33

1  Q. And in your role as chief, how often
2  were you asked to conduct internal investigations
3  into a public employee from a different agency?
4  A. Well, the number would certainly
5  fluctuate but I think probably every month, maybe
6  every two months.
7  Q. Okay. And every month, would that just
8  be one request from an agency?
9  A. Yes.
10 Q. And how would you typically receive that
11 communication?
12 A. There could be a couple of ways. I
13 suppose the most common would be to receive a phone
14 call directly. Another common path would be for
15 the -- there's a committee in the attorney general's
16 office, or was, I think it's still there -- called
17 the civil review committee and that is a group
18 of assistant attorneys general and other staff
19 members who review and receive complaints from
20 private citizens, from government employees and
21 government entities about alleged misdoings in
22 government operations.
23       And so the civil review committee
24 occasionally would refer a case. In other words,
25 someone would come to them and they'd say, "Not

### Page 34

1    appropriate for us. See Chief Wallentine."
2         Or they may ask to have an investigator
3    assigned to them to assist them in an investigation.
4    And occasionally -- I can't think of any specific
5    occasion but occasionally the attorney general or
6    one of the chief deputies might make a phone call or
7    refer somebody to me.
8         Q.  Okay.  In this case, to the best of your
9    knowledge, you remember it was Jeff Robinson who
10   called you directly.
11        A.  I believe so.
12        Q.  Had you known Jeff Robinson prior to
13   that phone call?
14        A.  I don't think so. You know, he may have
15   participated in continuing education activities or
16   something that I had done over the years but I
17   certainly didn't have any relationship with him.
18        Q.  Okay.  Had he ever asked you prior to
19   calling about Aaron Jensen to investigate a West
20   Jordan Police Department employee?
21        A.  I don't think so.
22        Q.  After Aaron's case did he ever call you
23   to ask for a similar favor?
24            MR. DODD: Objection. Misstates
25   testimony.

### Page 35

1        A.  I don't know that -- I don't know that I
2    ever had any other communication with him about any
3    other cases. It certainly wasn't referred to as a
4    favor. It's just something that was a fairly
5    routine type of request for our office.
6         Q.  Okay.
7         A.  If I had any other contact with him, I
8    don't recall.
9         Q.  Do you know how he knew to call you?
10            MR. DODD: Objection. Speculation.
11        A.  I don't. I mean, at the time you could
12   go to the attorney general's website and find my
13   name and contact information. I've been a police
14   officer or practicing public attorney for well over
15   three decades and I've served on a number of bar
16   committees. I'm not that hard to find.
17        Q.  Okay.
18        A.  I try to be now that I'm old and
19   retired. I try to be in sunny places most of the
20   time.
21        Q.  What do you remember Jeff Robinson
22   telling you in that phone call?
23            MR. DODD: Objection. Asked and
24   answered.
25        A.  I don't remember much of the phone call

### Page 36

1    other than telling me the general nature. I believe
2    that in the phone call he may have said something
3    about there being a number of reports because that
4    probably was a factor in why I selected Cord
5    Skinner. And I don't know if he suggested or if I
6    told him that it would be my preference because it
7    was my routine practice.
8         My employees and family will tell you, I
9    don't like telephones. I prefer to be in a room
10   with somebody. So I probably said, "You know, I
11   would prefer to come and sit down with you and bring
12   the investigator and tell us what you've got."
13        Q.  Okay.  And you said that you assigned
14   Cord because of the number of reports; is that
15   right?
16        A.  No. I assigned Cord in part because
17   there were a number of reports and Cord had -- when
18   Cord worked for me he handled a few cases that had a
19   lot of document management needs and he also had
20   particular skill with records management systems.
21        In law enforcement there are a number of
22   RMSs or records management systems and Cord had had
23   experience working with different agencies' record
24   management systems. So that, and the fact that he
25   was a really good investigator and, as I recall, had

### Page 37

1    some time, made him a good candidate.
2         Q.  Okay.  Do you remember if Jeff Robinson
3    had told you that a lieutenant and a captain from
4    the West Jordan Police Department had already
5    internally investigated Aaron?
6             MR. DODD: Objection. Form of the
7    question.
8         A.  I don't recall. I don't remember.
9         Q.  And if you'd look at Exhibit 9 from Cord
10   Skinner's deposition.  Have you seen Exhibit 9
11   before today?
12        A.  Yes.
13        Q.  When did you first see it?
14        A.  I don't recall but it would have been
15   about the time that it was completed, submitted for
16   approval, so it would have been over five years ago.
17        Q.  Okay.  And the investigative summary
18   that we're looking at, what's that report date?
19        A.  February 23, 2009.
20        Q.  Okay.  Would that have been the date
21   that it was completed or submitted for approval?
22        A.  That's typically the day -- it should
23   have been the day it was completed.
24        Q.  Okay.  So would you have approved this
25   report around that time?