**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| **AARON JENSEN,** | **MEMORANDUM DECISION** |
| **Plaintiff,** | **AND ORDER** |
| **vs.** | |
| **WEST JORDAN CITY, a Utah municipal corporation,** | **Case No. 2:12-CV-736-DAK** |
| | **Judge Dale A. Kimball** |
| **Defendant.** | |

This matter is before the court on Defendant West Jordan City's ("WJC's") Motion for Judgment as a Matter of Law, Motion for Reduction of Damages, Renewed Motion for Judgment as a Matter of Law, and Motion for New Trial or Remittitur and on Plaintiff Aaron Jensen's Motion to Alter or Amend the Judgment and Motion for Attorneys' Fees. The motions have been fully briefed. The court concludes that a hearing would not significantly aid its determination of the motions. Accordingly, the court issues the following Memorandum Decision and Order based on the written submissions of the parties and the law and facts relevant to the pending motions.

## DISCUSSION

The court will first address WJC's Motion for Reduction of Damages and Mr. Jensen's Motion to Alter or Amend Judgment in order to establish the proper amount for the judgment in this case. The court will then address WJC's Motion for Judgment as a Matter of Law and Renewed Motion for Judgment as a Matter of Law to establish whether and what portions of the judgment should stand. Finally, the court will address Mr. Jensen's Motion for Attorneys' Fees.

## WJC'S MOTION FOR REDUCTION OF DAMAGES

At the conclusion of the trial in this case, the jury completed its deliberations and returned a verdict in favor of Mr. Jensen in the amount of $2,774,400. Although the jury initially failed to allocate the damages among the different causes of action, the jury, following the court's order, eventually allocated the damages to the different causes of action. In allocating the damages, the jury found that Mr. Jensen suffered $2,740,400 in damages as a result of WJC's violation of Title VII and that those damages are separate and distinct from the damages awarded to Mr. Jensen by the jury for Mr. Jensen's other malicious prosecution, retaliation, and breach of contract claims.

After the verdict but before the court entered the judgment, WJC filed a Motion for Reduction of Damages asking the court to apply the statutory cap on damages in Title VII cases found in 42 U.S.C. § 1981a(b)(3) to the entire amount that the jury allocated to the Title VII claim. Because WJC had over 500 employees for twenty or more calendar weeks for the years during and preceding the events in question in this case, WJC requested the court to apply the cap of $300,000 to the Title VII damages. *See* 42 U.S.C. § 1981a(b)(3)(D) ("The sum of the amount of compensatory damages that may be awarded . . . for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section shall not exceed [$300,000]."). WJC also filed a proposed judgment reflecting the application of the statutory cap.

Although Mr. Jensen did not respond directly to WJC's motion, Mr. Jensen did file a Proposed Judgment asking the court to enter a judgment for the entire $2,740,400, which Mr. Jensen argues reflects the jury's decision and intent. In support of his argument, Mr. Jensen

attached a declaration from the jury foreperson in this case, which Mr. Jensen argues speaks to the jury's intent.

Although the court did not directly rule on WJC's Motion for Reduction of Damages, the court entered a Judgment that applied Title VII's statutory cap to the entire amount that the Jury allocated to Mr. Jensen's Title VII claim. Applying the statutory cap in that manner, the court entered a total judgment of $334,000 plus costs and attorney's fees in favor of Mr. Jensen. Therefore, the court GRANTED the Motion for Reduction of Damages when the court entered a Judgment that applied the statutory cap in the manner requested by WJC.

### MR. JENSEN'S MOTION TO ALTER OR AMEND THE JUDGMENT

"A rule 59(e) motion to alter or amend the judgment should be granted only 'to correct manifest errors of law or to present newly discovered evidence.'" *Phelps v. Hamilton*, 122 F.3d 1309, 1324 (10th Cir. 1997) (citations omitted); *see also* Fed. R. Civ. P. 59(e) (allowing for a motion to alter or amend judgment if it is filed "no later than 28 days after the entry of the judgment"). "A manifest error of law is 'the wholesale disregard, misapplication, or failure to recognize controlling precedent.'" *Susinka v. United States*, 19 F. Supp. 3d 829, 834 (N.D. Ill. 2014) (quoting *Oto v. Metro Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000)).

Mr. Jensen moved to alter or amend the judgment in this case because he argues that the Judgment contains a "manifest error of law." Specifically, Mr. Jensen argues that Title VII's statutory cap should not apply to the economic damages that the jury awarded to Mr. Jensen for WJC's violation of Title VII because, according to Mr. Jensen, the statutory cap does not apply to economic damages from discrimination, including back pay, front pay, and benefits.

Mr. Jensen is correct that the statutory cap does not apply to all damages awarded in Title VII cases. Under Section 706(g) of the Civil Rights Act of 1964, a court that determines a

plaintiff is entitled to a remedy for a defendants violations of Title VII can "enjoin the [defendant] from engaging in such unlawful employment practice, and order such affirmative action as my be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without backpay . . ., or any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e-5. Applying that language, courts have found that applicable plaintiffs "traditionally have been entitled to such remedies as injunctions, reinstatement, backpay, lost benefits, and attorney's fees under § 706(g) of the Civil Rights Act of 1964." *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 847-48 (2001). In 1991, Congress expanded the remedies available under Title VII to include "compensatory and punitive damages . . . in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964." 42 U.S.C. § 1981a(a)(1). However, Congress also placed caps on the "amount of compensatory damages awarded . . . for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages." 42 U.S.C. § 1981a(b)(3). In other words, if a specific remedy was "a type of relief authorized under § 706(g), it is excluded from the meaning of compensatory damages under § 1981a," and the statutory cap does not apply to it. *Pollard*, 532 U.S. at 853.

In this case, the jury awarded Mr. Jensen as damages for his Title VII retaliation claim $1,740,000 in non-economic damages, which both sides agree is subject to the statutory cap,[1] and $1,000,400 in economic damages, which the jury awarded Mr. Jensen for lost retirement benefits caused by Mr. Jensen's inability to go back to being a police officer following his arrest.

---

[1] Although Mr. Jensen agrees that Title VII's statutory cap should generally apply to non-economic damages, Mr. Jensen also argues that the jury intended to allocate the damages such that Mr. Jensen would receive the entire amount awarded on the Special Verdict Form, and Mr. Jensen provided a declaration from the jury foreperson to support that argument. However, the court considers the amounts written on the Special Verdict Form and allocated to the different causes of action to represent the intention of the jury, and the court is not going to alter the amounts or the allocations on the Special Verdict Form based on a declaration from the jury foreperson.

When Mr. Jensen voluntarily resigned from his position at WJC pursuant to a settlement agreement, Mr. Jensen still needed to complete 7 ½ years of service as a police officer in Utah in order to receive his retirement benefits through the Utah Retirement Systems ("URS") program. Therefore, the question before the court is whether the jury's award to Mr. Jensen of his lost retirement benefits was a type of remedy that courts were authorized to award under § 706(g) of Title VII to prevailing plaintiffs in post-employment retaliation cases.

Mr. Jensen simply argues that, under Section 706(g) of the Civil Rights Act of 1964, prevailing plaintiffs were "entitled to such remedies as injunctions, reinstatement, back pay, lost benefits, and attorney's fees." *Pollard*, 532 U.S. at 847. Because prevailing plaintiffs were entitled to the remedy of lost benefits and because the economic damages in this case were awarded to Mr. Jensen for his lost retirement benefits, Mr. Jensen argues that the jury's award of $1,000,400 in economic damages for his lost retirement benefits should not be subject to Title VII's statutory cap.

The court agrees that some lost benefits were available as a remedy under Section 706(g) of the Civil Rights Act of 1964. *See, e.g.*, *Rosen v. Pub. Serv. Elec. & Gas Co.*, 477 F.2d 90, 96 (3d Cir. 1973) (compensating early retirees "for the losses they sustained and are sustaining due to the discriminatory reduction in the amount of pension on account of service" and increasing "the retirement credit" for other male employees); *Walker v. Ford Motor Co.*, 684 F.2d 1355, 1364-65 (11th Cir. 1982) (adopting the rule that "compensatory and punitive damages are unavailable in Title VII suits" but recognizing that "the compensatory damages ban does not include concomitants of employment such as fringe benefits, pension benefits, or other lost work benefits" and that "a district court order restoring such lost benefits is in the nature of an injunction and falls within the equitable relief provisions of [Section 706(g)]"). The courts that

awarded damages for lost benefits under Section 706(g) often described those awards as being part of a complete award of backpay. *See, e.g.*, *Noel v. New York State Office of Mental Health Cent, New York Psychiatric Ctr.*, 697 F.3d 209, 213 (2d Cir. 2012) (defining back pay as "an amount equal to the wages the employee would have earned from the date of discharge to the date of reinstatement, along with lost fringe benefits such as vacation pay and pension benefits" (quoting *United States v. Burke*, 504 U.S. 229, 239 (1992), superseded by statute on other grounds); *Rasimas v. Michigan Dep't of Mental Health*, 714 F.2d 614, 626-27 (6th Cir. 1983) ("Backpay awards should completely redress the economic injury the claimant has suffered as a result of discrimination. A claimant, therefore, should receive the salary, including any raises, which he would have received but for discrimination. Sick leave, vacation pay, pension benefits and other fringe benefits the claimant would have received but for discrimination should also be awarded." (citations omitted)); *Meadows v. Ford Motor Co.*, 510 F.2d 939, 948 (6th Cir. 1975) ("If eligibility and discriminatory refusal are established, then back pay should be fully awarded, including compensation for fringe benefits then enjoyed by employees."); *Pettway v. Am. Cast Iron Pipe Co.*, 494 F.2d 211, 263 (5th Cir. 1974) ("[T]he ingredients of back pay should include more than 'straight salary.' Interest, overtime, shift differentials, and fringe benefits such as vacation and sick pay are among the items which should be included in back pay. Adjustment to the pension plan for members of the class who retired during this time should also be considered on remand."); *Sorrells v. Veterans Admin.*, 576 F. Supp. 1254, 1267 (S.D. Ohio 1983) (reinstating plaintiff to his position, ordering that he be provided with back pay, and granting plaintiff "retroactive seniority, sick leave, vacation pay, pension benefits and other fringe benefits in such fashion as though his employment . . . continued uninterrupted from [the date of the retaliatory discharge] until plaintiff's return to duty"). In other words, lost benefits were

available as a remedy under Section 706(g) of the Civil Rights Act of 1964, but those awards of lost benefits were considered to be a part of a complete award of backpay. As such, the remedy for lost benefits under Section 706(g) was used to restore the benefits of the former employer to the former employee for the period of time between the discriminatory termination until the entry of judgment by the court. Similarly, courts would restore the benefits of the former employer to the former employee under Section 706(g) for the period of time between judgment and reinstatement, or in lieu of reinstatement, as part of front pay awards. *See, e.g.*, *Pollard*, 532 U.S. at 853 ("[B]ackpay awards made for the period between the date of judgment and the date of reinstatement, which today are called front pay awards under Title VII, were authorized under § 706(g).").

However, just because some lost benefits is some forms were available as remedies under Section 706(g) of the Civil Rights Act of 1964, it does not necessarily follow that all lost benefits in all forms were similarly available. The lost retirement benefits awarded to Mr. Jensen by the jury in this case are different than typical lost benefits awarded to plaintiffs under Section 706(g). For example, because Mr. Jensen voluntarily resigned from his position at WJC, his claim for retirement benefits is not a claim that he is entitled to restoration of WJC's benefits in the form of back pay or front pay. Instead, Mr. Jensen claims that he is entitled to the benefits of future employment with a police department in Utah other than WJC, which he was not able to obtain due to the retaliatory conduct of WJC. Specifically, Mr. Jensen argues that WJC's retaliatory conduct led to his arrest and criminal prosecution, which damaged his record and reputation and prevented him from obtaining work as a police office at another police department.

Because of the unique nature of Mr. Jensen's claim for retirement benefits, the jury's award to Mr. Jensen of $1,000,400 in economic damages for lost retirement benefits is more

similar to an award for lost future earnings than it is to an award for front pay or back pay. An award for lost future earnings is given to compensate a plaintiff for "injuries [that] have narrowed the range of economic opportunities available to him . . . [and] caused a diminution in his ability to earn a living." *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 952 (7th Cir. 1998). Such an award "is a common-law tort remedy" and is analogous to an "'injury to professional standing' and to 'injury to character and reputation,' both of which have been identified by the Equal Employment Opportunity Commission as examples of nonpecuniary losses compensable under the 1991 Act." *Id.* Based on this reasoning, the Court of Appeals for the Seventh Circuit has concluded that awards for lost earning capacity fall within the category of "other nonpecuniary losses" and are among "[t]he broad compensatory remedies added to Title VII in the 1991 Civil Rights Act." *Id.* at 952-53; *see also Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 771 (7th Cir. 2006) (recognizing front pay as an equitable remedy and lost future earnings as a legal remedy).

Because the jury's award to Mr. Jensen of his lost retirement benefits in this case is comparable to an award for lost future earnings, the court concludes that the award falls within the category of "other nonpecuniary losses," which only became available in Title VII cases after the passage of the 1991 Civil Rights Act. Therefore, the court concludes that the award is subject to Title VII's statutory cap. Accordingly, Mr. Jensen's Motion to Alter or Amend the Judgment is denied.

### WJC'S MOTION/RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

On June 19, 2017, after Mr. Jensen completed the presentation of his evidence at trial, WJC filed a Motion for Judgment as a Matter of Law under Federal Rule of Civil Procedure 50(a). The court did not decide the motion at that time. When "the court does not grant a motion

for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed. R. Civ. P. 50(b). On July 19, 2017, after the jury was discharged and judgment was entered in this case, WJC filed a Renewed Motion for Judgment as a Matter of Law under Federal Rule of Civil Procedure 50(b).

"The standard in determining whether [a Rule 50(b) motion] should be granted is not whether there is literally no evidence to support the party opposing the motion, but whether there is evidence upon which the jury could properly find a verdict for that party." *Huffman v. Caterpillar Tractor Co.*, 908 F.2d 1470, 1478 (10th Cir. 1990). In other words, a court "must enter judgment as a matter of law in favor of the moving party if there is no legally sufficient evidentiary basis with respect to a claim or defense under the controlling law." *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1546-47 (10th Cir. 1996).

In its motions, WJC presents nine different reasons why the court should enter judgment in its favor as a matter of law. The court will address each of those arguments below.

**Timeliness of Title VII Claim**

Title VII claims, such as the claims filed by Mr. Jensen, have a statutory limit of 300 days from the time that an employee or former employee knows of a retaliatory adverse action until the employee or former employee files a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") or the "state agency that has authority over employment discrimination claims." *Benton v. Town of S. Fork Police Dep't*, 553 F. App'x 772, 779 (10th Cir. 2014) (internal quotation marks and citation omitted). "A claim not filed within these statutory limits is time barred." *Id.* A Title VII claim accrues when " a reasonable employee would have known of the employer's decision." *Id.* (internal quotation marks and citation

omitted). "But . . . an employee who discovers, or should have discovered, the *injury* (the adverse employment decision) need not be aware of the unlawful *discriminatory intent* behind that act for the limitations clock to start running." *Id.* (internal quotation marks and citation omitted). "Each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice and [the plaintiff] can only file a charge to cover discrete acts that occurred within 300 days of his filing." *Id.* (internal quotation marks, brackets, and citation omitted).

Although this time limit may be tolled in certain circumstances, "[i]n [the Tenth] circuit, a Title VII time limit will be tolled *only* if there has been active deception of the claimant regarding procedural requirements." *Jarrett v. US Sprint Commc'ns Co.*, 22 F.3d 256, 260 (10th Cir. 1994). In this case, Mr. Jensen concedes that he offered no evidence to support the requisite standard for tolling.

The evidence presented at trial demonstrated that Mr. Jensen was aware before signing the settlement agreement on April 29, 2009, that both a criminal investigation and a Police Officer Standards and Training ("P.O.S.T.") investigation were ongoing and could not be stopped by WJC. Mr. Jensen was then arrested on May 6, 2010, received discovery information in the criminal case by May 17, 2010, and shared information about WJC's involvement in the criminal investigation and prosecution with Dr. Soderquist, his treating physician, on May 26, 2010. All of this occurred more than 300 days before Mr. Jensen filed his Charge of Discrimination with the EEOC and the Utah Labor Commission on March 28, 2011, four days after he signed it. Therefore, Mr. Jensen is time barred from recovering for any of these discrete acts that may qualify as materially adverse actions.

However, at trial, Mr. Jensen argued that WJC did take materially adverse actions within the statutory limit of 300 days before he filed his Charge of Discrimination. Specifically, Mr. Jensen points to WJC's response to discovery requests, WJC employees' appearance and testimony during the preliminary hearing, and a possible offer by WJC's City Attorney, Jeff Robinson, to assist in drafting a motion in limine in Mr. Jensen's criminal trial. WJC argues that none of these actions by WJC constitute materially adverse actions for purposes of Title VII. On the Special Verdict Form, the jury was asked to provide a date on which Mr. Jensen first had knowledge that WJC had taken a materially adverse action against him and to provide a separate date for each adverse action. The jury only provided one date, November 9, 2010, which corresponds with WJC's response to a discovery request.

For purposes of a retaliation claim under Title VII, a materially adverse action encompasses "those acts that carry a 'significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects,'" unless the impact on future employment prospects is "*de minimis*." *Hillig v. Rumsfeld*, 381 F.3d 1028, 1032-33 (10th Cir. 2004). Courts "liberally define[] the phrase 'adverse employment action' . . . [and] take a case-by-case approach, examining the unique factors relevant to the situation at hand." *Sanchez v. Denver Public Schools*, 164 F.3d 527, 531 (10th Cir. 1998). Using this definition, the Tenth Circuit has found that "the filing of false criminal charges constituted an 'adverse employment action' because such an act causes 'harm to future employment prospects.'" *Hillig*, 381 F.3d at 1032 (quoting *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986-87 (10th Cir. 1996)). Applying a similar standard, the Seventh Circuit has held "that listing [a former employee's] name in publicly available SEC filings (and referring to her complaint as 'meritless') constituted a materially

adverse employment action." *Greengrass v. International Monetary Systems Ltd.*, 776 F.3d 481, 485 (7th Cir. 2015).

Even under this liberal definition for adverse action, the court cannot see how a defendant responding to discovery requests or a City Attorney offering to assist in drafting a motion in limine could cause more than *de minimis* harm to someone's future employment prospects, especially considering that neither of those actions is necessarily public. However, if a defendant knowingly provided false or fabricated testimony or knowingly failed to provide exculpatory information at a public preliminary hearing that led to a judge's decision to bind over criminal charges against a plaintiff, that action could cause more than *de minimis* damage to an individual's reputation and harm to the individual's future employment prospects. Given the unique factors relevant to the situation in this case, the harm to Mr. Jensen's reputation and future employment prospects is even more pronounced given the fact that his employment prospects were with police departments, which are more likely to recognize and care about the difference between charges being filed and charged being bound over by a judge.

Therefore, the question before the court is whether there is a legally sufficient evidentiary basis to support the claim that WJC employees knowingly provided false information or knowingly withheld exculpatory information at the preliminary hearing. The court concludes that a legally sufficient evidentiary basis does exist to support that claim. First, the court notes that, in order for the jury to reach its finding that WJC is liable on Mr. Jensen's Section 1983 claim for malicious prosecution, the jury needed to find that employees of WJC either knowingly provided false information or knowingly withheld exculpatory information, or both, at the preliminary hearing. Although conflicting evidence was presented at trial, the jury apparently assigned credibility to the evidence suggesting that WJC officers provided false information about the

amount of money given to Mr. Jensen by another officer, that WJC officers provided false information about when and how drugs appeared in Mr. Jensen's office, and that WJC withheld information related to Mr. Jensen's work schedule around the time of the booking of money into evidence. Therefore, although reasonable minds could differ as to the weight and credibility of evidence on both sides of the issue, the court concludes that there was sufficient evidence at trial for the jury to properly find that WJC took a materially adverse action against Mr. Jensen within the 300-day statutory limit for Title VII retaliation claims.

**"But For" Causation**

WJC also argues that Mr. Jensen did not present sufficient evidence from which a reasonable jury could find that Mr. Jensen's sexual harassment complaint was the "but for" cause of WJC's materially adverse actions. The but-for causation standard applies to three of Mr. Jensen's claims: Title VII retaliation, breach of the Negotiated Settlement Agreement, and Section 1983 retaliation under the First Amendment. To establish liability under Title VII, "an employee [must] demonstrate that, but for her protected activity, she would not have faced the alleged adverse employment action." *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1269 (10th Cir. 2015). Because the Negotiated Settlement Agreement requires WJC to comply with Title VII and also has its own non-retaliation provision, the same but-for standard applies to Mr. Jensen's claims for breach of the Negotiated Settlement Agreement. Finally, the "Supreme Court [has] held that the causation required in a First Amendment retaliatory prosecution claim connecting a retaliatory motive to the adverse action taken by the defendant is but-for causation, without which the adverse action would not have been taken." *McBeth v. Himes*, 598 F.3d 708, 717 (10th Cir. 2010) (internal quotation marks and citation omitted).

WJC argues that Mr. Jensen did not establish that WJC would not have cooperated in the manner it did had Mr. Jensen not previously made a sexual harassment complaint. However, the court does not agree that there is no legally sufficient evidentiary basis for the jury to have concluded, as it did, that WJC would not have taken the adverse actions against Mr. Jensen had Mr. Jensen not previously made a sexual harassment complaint. As stated in the Jury Instructions, the jury had the right to rely on indirect evidence to find that WJC employees would not have acted the way they did in the absence of Mr. Jensen's sexual harassment complaint. Evidence was presented at trial that some of WJC's officers were upset about being named in Mr. Jensen's sexual harassment complaint and that those same officers were instrumental in providing evidence against Mr. Jensen during the early stages of the internal investigation. Other evidence presented at trial suggested that Mr. Jensen may have been treated more harshly during the investigation than other officers who had committed similar violations. Therefore, the court concludes that a legally sufficient evidentiary basis existed for the jury to conclude that WJC employees would not have committed adverse actions against Mr. Jensen in the absence of Mr. Jensen's sexual harassment complaint.

**Municipal Liability**

"[M]unicipalities may be held liable on § 1983 claims only if a municipal policy or custom causes a violation of federal law." *David v. City & Cty. of Denver*, 101 F.3d 1344, 1357 (10th Cir. 1996). An action can be shown to be a policy of a municipality if the act is committed by a city official who has "final policymaking authority," *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (plurality opinion)), or if "the authorized policymakers approve a subordinate's decision and the basis for it," *Moss v. Kopp*, 559 F.3d 1155, 1168-69 (10th Cir. 2009). In this case, the jury was instructed that the City Manager, the Chief of Police,

and the City Attorney of WJC all have final policymaking authority. A custom of a municipality is "an act that, although not formally approved by an appropriate decision maker, has such widespread practice as to have the force of law." *Carney v. City & Cty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008) (citation omitted). To establish a custom, a plaintiff must prove that there was a "continuing, persistent, and widespread" practice by the defendant, which is usually shown by offering "evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way." *Id.* (citations omitted). But "proof of a single incident of unconstitutional activity is ordinarily not sufficient to impose municipal liability." *Moss*, 559 F.3d at 1168-69. A plaintiff may also establish a custom with evidence of "a series of decisions by a subordinate official of which the supervisor must have been aware." *Mitchell v. City & Cty. of Denver*, 112 Fed. App'x 662 672 (10th Cir. 2004) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988)). In such a case, "the supervisor could realistically be deemed to have adopted a policy that happened to have been formulated or initiated by a lower-ranking official." *Praprotnik*, 485 U.S. at 130. However, the knowledge attributed to the supervisor has to be more than simply a "mere failure to investigate the basis of a subordinate's discretionary decision." *Id.*

WJC argues that Mr. Jensen failed to establish any constitutional violation or act by a WJC employee with final policymaking authority or to establish a custom of unconstitutional conduct by WJC. Specifically, WJC argues that Mr. Jensen has failed to present any evidence that any of WJC's final policymakers took the actions that Mr. Jensen alleges violated his constitutional rights or that WJC had a widespread practice of unconstitutional conduct.

Evidence was presented at trial, which the jury apparently found to be credible, suggesting that WJC's City Attorney, Jeff Robinson, showed unusual interest in Mr. Jensen's criminal case. Mr. Robinson's interest in the case was especially unusual because the case was

being prosecuted by Salt Lake County and not by WJC. Some evidence was also presented that Mr. Robinson attended events associated with Mr. Jensen's criminal case, even though his attendance at the events was not necessary, and that he even offered to help draft documents for the case. Because the jury found that WJC employees decided to knowingly provide false information or knowingly withhold exculpatory information, or both, at a preliminary hearing, the jury could have also reasonably found through the evidence presented that Mr. Robinson must have been aware of this decision, even if the decision was formulated or initiated by other WJC employees. Because the jury apparently found that Mr. Robinson was aware of the WJC employees' decision, Mr Robinson can realistically be deemed to have adopted a policy authorizing the decision. Therefore, the court concludes that the jury was presented with a legally sufficient evidentiary basis to find municipal liability against WJC.

**Malice**

"In the Tenth Circuit, state law provides the starting point for a § 1983 claim of malicious prosecution." *Chase v. Cedar City Corp.*, No. 2:05-CV-293, 2006 WL 2623934, at *7 (D. Utah Sept. 13, 2006) (citation omitted). "Under Utah law, there are four elements to a malicious prosecution claim, all of which must be proven: '(1) A criminal proceeding instituted or continued by the defendant against the plaintiff; (2) termination of the proceeding in favor of the accused; (3) absence of probable cause for the proceeding; (4) "malice," or a primary purpose other than that of bringing an offender to justice.'" *Id.* (quoting *Callioux v. Progressive Ins. Co.*, 745 P.2d 838, 843 (Utah Ct. App. 1987)). "[A] party simply cannot report a suspected crime in good faith while at the same time meeting this malice requirement." *Magistro v. Day*, 2010 UT App 397, 2010 WL 5550448, at *1, n.1 (unpublished).

WJC argues that Mr. Jensen failed to provide sufficient evidence from which a reasonable jury could find in his favor on the fourth element requiring malice. Specifically, WJC argues that Mr. Jensen's speculation that WJC cooperated with the Salt Lake County District Attorney's Office investigation primarily to get back at Mr. Jensen for filing a sexual harassment claim, and not for the primary purpose of bringing Mr. Jensen to justice, is insufficient to establish the malice element. However, as already described above, evidence was presented at trial, beyond Mr. Jensen's speculation, from which a jury could reasonably conclude that WJC's primary motivation was other than brining Mr. Jensen to justice. Such evidence includes testimony that some WJC employees were angry with Mr. Jensen for filing the sexual harassment complaint, that some WJC employees pursued the investigation of Mr. Jensen more vigorously than they would have pursued an investigation into other officers who had committed similar offences, and that WJC's City Attorney showed unusual interest in the outcome of Mr. Jensen's criminal case. Therefore, the court concludes that a sufficient evidentiary basis existed for the jury to reasonably conclude that WJC acted out of malice.

**Lack of Probable Cause**

In order for Mr. Jensen to succeed on both his § 1983 malicious prosecution claim and his § 1983 First Amendment retaliation claim based on the criminal charges brought against him, Mr. Jensen had to establish a lack of probable cause for the criminal charges. Where, as here, a plaintiff is basing the lack of probable cause on the defendant providing false information or withholding exculpatory information that would have negated the probable cause, the court engages in a five-step inquiry.

> First, the court determines in there is a question of fact as to whether particular items of evidence were fabricated; second, the court eliminates those items from consideration in its probable cause analysis; third, the court determines whether exculpatory evidence was improperly excluded from consideration; fourth, the

court includes any such evidence in its analysis; fifth, the court determines
whether probable cause still exists after factoring in all exclusions and additions.

*Miller v. Arbogast*, 445 Fed. App'x 116, 119-20 (10th Cir. 2011). "Probable cause exists if the

facts and circumstances known to the officer warrant a prudent man in believing that the offense

has been committed." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1281 (10th Cir. 2008).

WJC argues that Mr. Jensen did not present any credible evidence at trial that WJC

intentionally or with reckless disregard fabricated evidence. According to WJC, Mr. Jensen only

identified the following two alleged, intentional omissions: that WJC did not provide copies of

his October 2007 timecards to the Salt Lake County District Attorney's Office before his arrest

and that WJC did not inform the Salt Lake County District Attorney's Office that Mr. Jensen

offered to take a polygraph test. But WJC argues that no reasonable jury could conclude that

these omissions were intentional or material, and WJC argues that the information was presented

during the preliminary hearing, where the judge found probable cause for Count 2. WJC further

argues that, because all of the information was presented at the preliminary hearing, the finding

of probable cause by the judge breaks the chain of causation for Mr. Jensen's malicious

prosecution claim. *See Taylor v. Meacham*, 82 F.3d 1556, 1564 (10th Cir. 1996). Finally, WJC

argues that any other information relied on by Mr. Jensen is not sufficient to negate probable

cause, especially when compared to the evidence supporting probable cause.

As mentioned above, sufficient evidence was presented at trial, which the jury apparently

found credible, suggesting that WJC officers may have provided false information about the

amount of money given to Mr. Jensen by another officer, that WJC officers provided false

information about when and how drugs appeared in Mr. Jensen's office, and that WJC withheld

information related to Mr. Jensen's work schedule around the time of the booking of money into

evidence. The court concludes that the jury could have reasonably relied on that evidence to negate the probable cause that was found to exist at the preliminary hearing.

**Contractual Obligations**

To settle the underlying discrimination claims in this case, Mr. Jensen and WJC signed two different documents: a Settlement Agreement and a Negotiated Settlement Agreement. The Settlement Agreement was signed by Mr. Jensen and WJC on April 29, 2009. The Negotiated Settlement Agreement was between Mr. Jensen, WJC, and the Utah Anti-Discrimination and Labor Division ("UALD"). Mr. Jensen and WJC signed the Negotiated Settlement Agreement on April 29, 2009, but the UALD did not sign the Negotiated Settlement Agreement until May 14, 2009. Mr. Jensen argues that the Settlement Agreement and the Negotiated Settlement Agreement constitute one contract, but WJC argues that the two documents are separate contracts. Determining whether the two agreements constitute one or two contracts is a question of law for the court. *See, e.g.*, *Uhrhahn Const. & Design, Inc. v. Hopkins*, 2008 UT App 41, ¶ 11, 179 P.3d 808. The question was presented by the parties during the jury instruction conference, but the court reserved ruling on the question at that time. But the court did submit a separate question for each of the documents to the jury.

Mr. Jensen argues that the two contracts are the same because the Settlement Agreement references the Negotiated Settlement Agreement. However, WJC argues that the two documents are separate contracts because, although the Settlement Agreement does reference the Negotiated Settlement Agreement, the Settlement Agreement does not incorporate the terms of the Negotiated Settlement Agreement. *See Housing Auth. of Cty. of Salt Lake v. Snyder*, 44 P.3d 724, 729 (Utah 2002) ("[T]he terms of another document cannot be incorporated by reference without

specific language. . . . [T]he reference must be clear and unequivocal." (internal quotation marks and citation omitted)).

Under Utah law, "where two or more instruments are executed by the same parties contemporaneously, or at different times in the course of the same transaction, and concern the same subject matter, they will be read and construed together so far as determining the respective rights and interests of the parties, although they do not in terms refer to each other." *Bullfrog Marina, Inc. v. Lentz*, 501 P.2d 266, 270-71 (Utah 1972) *disapproved of on other grounds by Tangren Family Tr. v. Tangren*, 182 P.3d 326 (Utah 2008). Several other courts apply a similar standard to determine whether multiple agreements should be legally construed as a single contract. *See, e.g.*, *Joy v. City of St. Louis*, 138 U.S. 1, 38 (1891) (finding that multiple agreements "constituted a single transaction, relating to the same subject-matter, and should be construed together in such a way as to carry into effect the intention of the parties, in view of their situation at the time and of the subject-matter of the instruments."); *Dakota Gasification Co. v. Natural Gas Pipeline Co.*, 964 F.2d 732, 734-35 (8th Cir. 1992) ("Thus, as a rule of law, [multiple contracts] should be read together [if] they represent successive steps which were taken to accomplish a single purpose. This rule of interpretation applies even though the parties executing the contracts differ, as long as the several contracts were known to all the parties and were delivered at the same time to accomplish an agreed purpose." (internal quotations marks and citations omitted)); *Bob Smith Auto. Grp., Inc. v. Ally Fin. Inc.*, No. 1655 SEPT. TERM 2014, 2016 WL 3613402, at *7 (Md. Ct. Spec. App. July 6, 2016) (recognizing the "general rule" that "in the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same contracting parties for the same purpose, and in the course of the same transaction will be considered and construed together, since they are, in the eyes of the law, one

contract or instrument." (citations omitted)); *see also* Restatement (Second) of Contracts § 202(2) (1981) ("A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together.").

Courts consider factors such as the following to determine whether two documents should be construed as one contract: whether the parties are the same, whether the agreements are "mutually dependent," whether the agreements refer to each other, and whether the agreements serve the same purposes. *See, e.g.*, *Arciniaga v. Gen. Motors Corp.*, 460 F.3d 231, 237 (2d Cir. 2006). Courts may also consider whether the agreements were "executed in close temporal proximity" to each other. *See, e.g.*, *Halliburton Co. v. KBR, Inc.*, 446 S.W.3d 551, 563-64 (Tex App. 2014) (concluding that two agreements "must be harmonized and construed together as one contract" because the agreements are "between the same parties, signed five days apart, [and] are facets of the same transaction entered into for [a] unitary purpose").

In this case, both the Settlement Agreement and the Negotiated Settlement Agreement included WJC and Mr. Jensen as parties, the Settlement Agreement references the Negotiated Settlement Agreement, WJC and Mr. Jensen signed both agreements on the same day, and WJC and Mr. Jensen entered into both agreements for the same purpose of settling Mr. Jensen's discrimination claims against WJC. Although the Negotiated Settlement Agreement also included UALD as a party and neither agreement incorporated the terms of the other, these minor factors are not sufficient to outweigh the factors in favor of construing the documents as one contract. Therefore, the court concludes that the Settlement Agreement and the Negotiated Settlement Agreement should be construed as one contract as a matter of law.

WJC is only arguing that it is entitled to a directed verdict that is did not breach the neutral-reference provision of the Settlement Agreement. WJC is not arguing that it is entitled to

a directed verdict that it did not breach the non-retaliation provision of the Negotiated Settlement Agreement. Because the court concludes that the agreements should be construed as one contract, the court concludes that evidence exists upon which the jury can properly rely that WJC breached the contract and the associated covenant of good faith and fair dealing with Mr. Jensen.

**Factual Cause**

WJC argues that Mr. Jensen failed to establish that WJC is the factual cause of his damages or, in other words, WJC argues that Mr. Jensen would have suffered the same damages regardless of whether WJC actually acted wrongfully towards Mr. Jensen following the settlement. "In the usual course, [the] standard [for proving damages] requires the plaintiff to show that the harm would not have occurred in the absence of –that is, but for—the defendant's conduct." *Univ. of Texas Sw. Med. Ctr. V. Nassar*, 133 S. Ct. 2517, 2525 (2013).

WJC's primary argument is that Mr. Jensen did not present sufficient evidence to establish that the wrongful actions of WJC cause Mr. Jensen's unemployment during the year between his voluntary resignation from WJC and his eventual arrest. WJC thinks this year is significant because Mr. Gary Couillard, Mr. Jensen's damages expert, based at least one of his estimations of damages on that assumption that Mr. Jensen would secure another job in law enforcement by June 1, 2009, just over a month after his resignation on April 29, 2009.

While the court sees some merit to WJC's arguments, the court also recognizes that the jury's award of damages was not dependent on the jury relying on the fact that Mr. Jensen would have secured another law enforcement job by June 1, 2009. As described above, the 1991 amendments to Title VII allow a jury to award damages to a plaintiff for future pecuniary losses and other nonpecuniary losses, among other things. Under these amendments, courts have allowed plaintiffs to recover damages for lost future earnings, which is very similar to Mr.

Jensen's damages for lost future benefits. Because the jury could award Mr. Jensen damages for lost future benefits, the jury could have reasonably concluded that WJC's wrongful actions prevented Mr. Jensen from securing another law enforcement job at any point after his arrest and that his total lost retirement benefits was the proper award of damages for that wrongful conduct. Because a legally sufficient evidentiary basis exists for such a conclusion by the jury, the court concludes that WJC is not entitled to judgment as a matter of law on the issue of establishing the factual cause for Mr. Jensen's damages.

**Lack of Foundation for Expert Assumption**

WJC also argues that Mr. Jensen cannot recover for lost retirement benefits because Mr. Jensen failed to lay the proper foundation for the assumptions underlying the testimony of Mr. Couillard. "Damages will not be awarded when the evidence surrounding them is uncertain or speculative." *Boehm v. Fox*, 473 F.2d 445, 448 (10th Cir. 1973).

WJC argues that Mr. Jensen's damages award for lost retirement benefits is based on the assumption that Mr. Jensen was unable to complete 7 ½ years of additional service as a Utah law enforcement officer, but Mr. Jensen did not offer any evidence from which a reasonable jury could find that, but for WJC's conduct, Mr. Jensen would have completed the additional 7 ½ years of service. WJC specifically points to testimony that Mr. Jensen did not apply for any police jobs since leaving WJC, even after his charges were expunged, and that he has not attended the P.O.S.T. academy since his resignation.

In addition to the evidence highlighted by WJC, other evidence was presented at trial related to Mr. Jensen's ability to obtain additional employment as a law enforcement officer. For example, several officers testified that Mr. Jensen was one of the best sergeants that they had ever worked with, and Troy Rawlings, the Davis County Attorney, testified that he talked with

Mr. Jensen about finding him a law enforcement job in his city but that no openings were available. The jury could have also reasonably inferred that it would have been a waste of time for Mr. Jensen to apply for a law enforcement position when he had criminal charges pending and when the status of his P.O.S.T. certification was in question. Mr. Jensen even testified to that effect. Therefore, the court concludes that some evidentiary basis exists for the jury to have concluded, as it did, that, but for WJC's conduct, Mr. Jensen could have obtained another law enforcement position and completed an additional 7 ½ years of service.

**Proximate Cause of Psychological Injuries**

"It is uniformly held that where injuries complained of are of such character as to require skilled and professional persons to determine the cause and extent thereof, they must be proved by the testimony of medical experts." *Franklin v. Shelton*, 250 F.2d 92, 97 (10th Cir. 1957); *see also Tweed v. Bertram*, No. 2:02-CV-161, 2004 WL 6043280, at *2 (D. Utah Apr. 20, 2004) (unpublished) ("[T]he rule expressed several years ago by the Tenth Circuit in *Franklin* . . . is still the controlling law."). Injuries are of a character to require professional persons to determine the cause and extent if the injuries are not "susceptible to observation by an ordinary person" and are "of a nature requiring competent medical testimony to establish their cause, and their cause could not by laymen be definitely attributed to the accident, absent medical testimony to that effect." *Franklin*, 250 F.2d at 97-98. If a treating physician is called as a witness, the treating physician can only opine on causation "to the limited extent that opinions about the cause of an injury are a necessary part of a patient's treatment." *Starling v. Union Pac. R. Co.*, 203 F.R.D. 468, 478-79 (D. Kan. 2001).

WJC claims that, as a matter of law, the in-trial testimony of Dr. Soderquist, Mr. Jensen's treating physician, regarding the cause of Mr. Jensen's psychological injuries was inadmissible

because the testimony went "beyond the care and treatment of" Mr. Jensen. *Goeken v. Wal-Mart Stores, Inc.*, No. 99-4191-SAC, 2001 WL 1159751, at *2 (D. Kan. Aug. 16, 2001). Because the portion of Dr. Soderquist's testimony regarding causation was inadmissible, WJC argues that Mr. Jensen did not offer any evidence to show that WJC's conduct after April 29, 2009, was the proximate cause of Mr. Jensen's psychological injuries.

Although some evidence of Mr. Jensen's officially diagnosed psychological injuries, such as depression, was presented at trial, Mr. Jensen's psychological injuries were not the primary injuries discussed at trial related to Mr. Jensen's non-economic damages. Evidence of several other injuries, which are more susceptible to observation by an ordinary person, was presented at trial. Such injuries included Mr. Jensen's inability to get a job in the field that he desired; the loss of Mr. Jensen's marriage; the loss of association with Mr. Jensen's friends, who Mr. Jensen referred to as family; the loss of Mr. Jensen's house; and the damage to Mr. Jensen's reputation in the law-enforcement community. Even excluding evidence of Mr. Jensen's psychological injuries from the evidence presented at trial, the court concludes that a sufficient evidentiary basis exists to sustain the jury's award of non-economic damages to Mr. Jensen.

## WJC'S MOTION FOR NEW TRIAL

Pursuant to Federal Rule of Civil Procedure 59, "[t]he court may, on motion, grant a new trial on all or some the issues—and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). A "trial judge has broad discretion" to determine whether to "set aside the jury's verdict" and grant a motion for a new trial, but the trial judge also "has the obligation or duty to ensure that justice is done." *McHargue v. Stokes Div. of Pennwalt Corp.*, 912 F.2d 394, 396 (10th Cir. 1990). A trial judge may set aside the jury's verdict "when he believes the verdict to

be against the weight of the evidence or when prejudicial error has entered the record." *Id.* A remittitur, or "a new trial if the plaintiff refuses to accept it," may also be proper "where the court believes that the judgment for damages is excessive, that is, it is against the weight of the evidence." *Holmes v. Wack*, 464 F.2d 86, 89 (10th Cir. 1972). "A finding of sufficient evidence to create a jury question under Rule 50 does not preclude a finding that the actual verdict rendered was against the weight of the evidence for purposes of Rule 59." *Cholier, Inc. v. Torch Energy Advisors, Inc.*, No. 95-6177, 1996 WL 196602, at *5 (10th Cir. Apr. 24, 1996) (unpublished). "Additionally, it is within the trial court's discretion to order a new trial on damages alone when the jury's award is speculative or excessive." *Id.*

Although a trial judge has broad discretion to order a new trial, the court should also "respect the collective wisdom of the jury" and "in most cases the judge should accept the finding of the jury, regardless of his own doubts in the matter." *Landes Const. Co. v. Royal Bank of Canada*, 833 F.2d 1365 1371 (9th Cir. 1987) (citation omitted). Although the court "need not view the evidence from the perspective most favorable to the prevailing party," the court should give "full respect to the jury's findings." *Id.* (citation omitted). After giving the jury's findings full respect, the judge should grant a new trial only if "the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* at 1372 (citation omitted). In determining whether to order a new trial on damages, the court should also give proper respect to the "time-honored principle" that "the determination of the quantum of damages in civil cases is a fact-finder's function" and that "[t]he trier of fact, who has the first-handed opportunity to hear the testimony and observe the demeanor of the witnesses, is clothed with a wide latitude and discretion in fixing damages pursuant to the court's instruction." *Mason*

*v. Texaco, Inc.*, 948 F.2d 1546, 1559 (10th Cir. 1991) (quoting *Bennett v. Longacre*, 774 F.2d 1024, 1028 (10th Cir. 1985)).

In its Motion for New Trial or Remittitur, WJC argues that it is entitled to a new trial on four different grounds. The court will address each of WJC's arguments below.

**Verdict against the Weight of the Evidence**

WJC argues that the jury's conclusion that WJC is liable to Mr. Jensen on each of the seven claims that were submitted to the jury is against the great weight of evidence. WJC specifically argues that it was against the great weight of evidence for the jury to find that: (1) Mr. Jensen did not first know of WJC's involvement in the criminal investigation until November 9, 2010, such that his EEOC charge of discrimination was filed within 300 days of gaining this knowledge; (2) Mr. Jensen's sexual harassment complaint was the "but for" cause of any materially adverse action taken against him by WJC after April 29, 2009; (3) One or more unconstitutional acts were taken after April 29, 2009, by a WJC employee with final policymaking authority; (4) WJC engaged in an unconstitutional act that was the proximate cause of damages suffered by Mr. Jensen; (5) WJC acted with malice, meaning for a primary purpose other than bringing Mr. Jensen to justice; (6) WJC instigated and intentionally caused Mr. Jensen to be criminally charged, or that WJC knowingly misrepresented or concealed material facts after April 29, 2009; (7) There was no probable cause for Mr. Jensen's arrest and prosecution, or that WJC withheld exculpatory evidence or made false statements; (8) WJC breached the settlement agreement and the associated covenant of good faith and fair dealing; (9) WJC was the proximate cause of Mr. Jensen's damages, if any; (10) Mr. Jensen is entitled to recover for lost retirement benefits based on the opinion testimony of Gary Couillard and the

assumptions underlying his opinions; and (11) Mr. Jensen's emotional distress was caused by wrongful acts, if any, of WJC after April 29, 2009.

The court first notes that some of the jury's alleged findings that WJC argues are against the weight of evidence are not necessary findings to uphold the jury's verdict in this case. For example, WJC argues that it was against the weight of evidence for the jury to find that Mr. Jensen did not first know of WJC's involvement in the criminal investigation until November 9, 2010. However, the jury did not need to find that Mr. Jensen did not first know of WJC's involvement in the criminal investigation until November 9, 2010, for the jury to find WJC liable for retaliation under Title VII. As mentioned above, the jury found that WJC employees either provided false information or withheld exculpatory information during Mr. Jensen's preliminary hearing in his criminal case, which would qualify as a materially adverse action under the Tenth Circuit's liberal definition. Because the jury found that WJC took a materially adverse action within 300 days of Mr. Jensen filing his charge of discrimination with the EEOC, the jury did not also have to find that Mr. Jensen did not first know of WJC's involvement in the criminal investigation until November 9, 2010. Similarly, because the court concluded above that the Settlement Agreement and the Negotiated Settlement Agreement constitute one contract, the jury did not need to find that WJC independently breached the Settlement Agreement and the associated covenant of good faith and fair dealing in order to uphold the verdict that WJC is liable for breach of the contract at issue in this case. Finally, WJC argues that the weight of evidence is against finding the assumptions necessary to support Gary Couillard's testimony regarding Mr. Jensen's lost retirement benefits. WJC appears to be basing this argument on the fact that Mr. Jensen did not offer evidence of a specific police officer job that he failed to get. But, as the court explains above, in this case, Mr. Jensen's lost retirement benefits are similar to

lost future earnings, which are based on a general harm to reputation and do not require proof of loss of a specific job. *See, e.g.*, *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 954 (7th Cir. 1998) ("[A] lost future earnings award compensates the plaintiff for the diminution in expected earnings in *all* of her future jobs for as long as the reputational or other injury may be expected to affect her prospects." (emphasis added)).

In terms of the rest of the jury's findings, the court has already concluded that a legally sufficient evidentiary basis exists on each of the claims for the jury to have properly found a verdict in favor of Mr. Jensen. The court now concludes that, not only was the evidentiary basis sufficient for the jury to find a verdict in favor of Mr. Jensen, but also that the jury's verdict was not rendered against the weight of the evidence. Specifically, if WJC took a materially adverse action against Mr. Jensen, which the jury found that it did, the evidence presented at trial left little explanation for that adverse action other than Mr. Jensen's sexual harassment complaint. Therefore, the court is unable to conclude that the jury's finding that Mr. Jensen's sexual harassment complaint was the "but for" cause of WJC's materially adverse action against him was against the weight of evidence. The same can be said for the jury's finding that WJC acted with malice. In terms of whether unconstitutional acts were taken by a WJC employee with final policymaking authority, evidence was presented that Jeff Robinson, the WJC City Attorney, had an unusual interest in Mr. Jensen's criminal case, and Mr. Jensen offered indirect evidence suggesting that the unusual interest was a result of Mr. Jensen's sexual harassment complaint. WJC offered little evidence of other possible reasons for Mr. Robinson's unusual interest. Therefore, the court cannot conclude that the jury's finding that a WJC employee with final policymaking authority took unconstitutional acts, as explained in more detail above, was against the weight of evidence. Mr. Jensen also presented evidence suggesting that the damages he

suffered, including his lost retirement benefits, were proximately caused by WJC. Although WJC presented evidence at trial that Mr. Jensen was already experiencing some emotional distress prior to the alleged retaliation, sufficient evidence was presented regarding the exacerbation of Mr. Jensen's mental health issues, job instability, and marital problems that the court is unable to conclude that the jury's decision in this regard was against the weight of the evidence.

**Verdict is Excessive**

WJC also argues that it is entitled to a new trial on the Title VII retaliation claims because the verdict is excessive. A new trial on damages is appropriate if an award is "so excessive . . . as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial." *Barnes v. Smith*, 305 F.2d 226, 228 (10th Cir. 1962). Otherwise, "the jury's determination of the facts is considered inviolate." *Id.*

WJC's argument that the verdict is excessive focuses on the fact that Mr. Jensen did not have, apply for, or take steps to become qualified for another police officer position and that Mr. Jensen suffered from substantially similar psychological injuries before and after the alleged retaliation. However, as already mentioned, because Mr. Jensen's claim for lost retirement benefits is based on a general harm to his reputation that prevented him from being able to get any Utah police officer position in the future, Mr. Jensen did not have to present evidence of a specific job that he lost due to the retaliation. Sufficient evidence was presented at trial that the damage to Mr. Jensen's reputation harmed his future prospects of becoming a police officer in Utah. Therefore, the jury reasonably concluded that Mr. Jensen was entitled to the entire reward of his lost retirement benefits.

Similarly, although evidence was presented of Mr. Jensen's psychological, marital, and professional state prior to the alleged retaliation, evidence was also presented that Mr. Jensen's state grew significantly worse in each of those areas after the retaliation occurred. Specifically, Mr. Jensen presented evidence through his personal testimony as well as through the testimonies of his father and his therapist that he suffered significant emotional distress following the retaliation. Similarly, although Mr. Jensen had some marital difficulties prior to the retaliation, Mr. Jensen's marriage ended after the retaliation. Finally, although Mr. Jensen had some difficulty finding and keeping a job before the retaliation occurred, Mr. Jensen had found a job that he enjoyed and was performing well in, which he lost due to his arrest related to the malicious prosecution in this case. Therefore, the jury was presented with sufficient evidence to reasonably conclude that Mr. Jensen suffered damages as a result of WJC's conduct. Furthermore, the court concludes that the jury's award of $1,740,000 in non-economic damages as a result of the Title VII retaliation was not excessive to compensate Mr. Jensen for the exacerbation of his psychological injuries, his lost marriage, his lost employment, and the harm to his reputation.

**Inadmissible Evidence, Improper Jury Instructions, and Exclusion of Relevant Evidence**

WJC also argues that it is entitled to a new trial because of errors in the admission of evidence. Specifically, WJC argues that inadmissible evidence was introduced, that the court gave improper jury instructions, and that relevant evidence was excluded. "If error is found in the admission of evidence, [the court should] set aside a jury verdict only if the error prejudicially affects a substantial right of a party." *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1296 (10th Cir. 1998). "Evidence admitted in error can only be prejudicial 'if it can be reasonably

concluded that with or without such evidence, there would have been a contrary result.'" *Id.* (citation omitted).

WJC first argues that irrelevant and substantially prejudicial character and hearsay evidence regarding Captain Gallagher should have been excluded. Although "Fed. R. Evid. 404(b) generally excludes evidence of other acts for the purpose of proving a person acted similarly on other occasions," the Tenth Circuit has "modified this general rule somewhat in the context of employee discharge cases requiring proof of discriminatory intent." *Coletti v. Cudd Pressure Control*, 165 F.3d 767, 776 (10th Cir. 1999). "The testimony of other employees about their treatment by the defendant employer is relevant to the issue of the employer's discriminatory intent if the testimony establishes a pattern of retaliatory behavior or tends to discredit the employer's assertion of legitimate motives." *Id.* However, regardless of whether the evidence regarding Captain Gallagher was admissible in this case, the court concludes that the evidence was not prejudicial. Specifically, the court concludes that the jury would not have reached a contrary result even if the evidence was excluded because the retaliation claims in this case hinged on actions of WJC employees other than Mr. Gallagher.

WJC next points to multiple instances in which it claims that Mr. Jensen was allowed to introduce inadmissible hearsay and opinion testimony. In terms of hearsay statements, WJC specifically points to Lieutenant Rees's testimony that he told the Salt Lake County District Attorney's Office investigator that the criminal investigation into Mr. Jensen was not legitimate and that the facts were being manipulated, to Mr. Jensen's testimony about WJC's response to David Kwant's criminal conduct, and to Mr. Jensen's references to alibi documents not produced during discovery. The Federal Rules of Evidence define hearsay as "a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offered in

evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Therefore, "[s]tatements offered for the effect on the listener . . . are generally not hearsay." *Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1434 (10th Cir. 1993). Based on this reasoning, the court concludes that Lieutenant Rees's statement and Mr. Jensen's references to alibi documents do not qualify as hearsay because they were offered to show their effect on the listeners, specifically the effect of the statements on Salt Lake County and Mr. Rawlings's decisions regarding Mr. Jensen's criminal case, and not for the truth of the matters asserted. In terms of Mr. Jensen's statements regarding Mr. Kwant, the court ruled before trial that Mr. Jensen could only testify as to the allegations of Mr. Kwant of which he had personal knowledge. Mr. Jensen's testimony largely complied with that ruling, although it required WJC to object several times during that portion of Mr. Jensen's testimony.

In terms of opinion testimony, WJC argues that the opinion testimonies of Brenda Beaton and Dr. Jean Soderquist were inadmissible because Ms. Beaton was never designated as an expert and Dr. Soderquist was not retained as an expert but still testified about the cause of Mr. Jensen's injuries, even though that was not a necessary component of her treatment. During her testimony, Ms. Beaton generally her opinions based on what she perceived during her experience as an attorney. But a lay witness may give "testimony in the form of an opinion" as long as it is, among other things, limited to testimony that is "rationally based on the witness's perception." Fed. R. Evid. 701. The court concludes that Ms. Beaton's testimony was proper for a lay witness and did not cross the line into testimony "based on scientific, technical, or other specialized knowledge," which is reserved for expert witnesses. *Id.* Dr. Soderquist did not testify specifically as to what caused Mr. Jensen's mental health conditions, although she testified about her observations and about what Mr. Jensen said caused him the most emotional pain. The jury drew

reasonable inferences from that testimony and other evidence to conclude that some of Mr. Jensen's emotional pain was caused by WJC, and the jury awarded damages based on those reasonable inferences. Finally, WJC argues that Gary Couillard should not have been allowed to offer previously undisclosed opinion testimony about whether Mr. Jensen could qualify for the "Rule 20" retirement. However, the court allowed WJC to provide an expert, Brad Townsend, who disputed Mr. Couillard's claim. Therefore, the court concludes that none of the testimony that WJC argues was inadmissible hearsay or opinion testimony was admitted in error.

WJC also argues that the court should have completely excluded the testimonies of Troy Rawlings and Sim Gill because, according to WJC, they lacked any personal knowledge as to any disputed issues of fact. The court considered the arguments regarding whether Mr. Rawlings and Mr. Gill's testimonies should be excluded in their entirety before trial because WJC made those arguments in pre-trial motions. At that time, the court ruled that the testimonies should be allowed, but the court placed restrictions on those testimonies to alleviate the concerns raised by WJC. The court reminded Mr. Jensen of those restrictions before Mr. Rawlings testified. The court's conclusion about those testimonies has not changed. The testimonies were relevant to explain why Mr. Jensen's criminal prosecution was transferred from Salt Lake County to Davis County and why the charges against Mr. Jensen were dismissed and later expunged. The testimonies largely stayed within the restrictions that the court placed on them, and the court concludes that the testimonies were not admitted in error.

WJC next argues that the jury was erroneously instructed regarding pre-settlement conduct and a custom of the city. Specifically, WJC argues that the court erroneously instructed the jury that they could consider pre-settlement conduct, but not pre-settlement claims, despite the release and covenant not to sue that was included as part of the settlement agreement. The

release and covenant not to sue applied to all obligations, debts, claims, demands, controversies, lawsuits, costs, fees, commissions, expenses, further performance, and liabilities, and, by its terms, it was supposed to receive the broadest possible interpretation. Even giving the language the broadest interpretation, the court concluded that each of terms that the release and covenant to sue applied to was characterized by the attachment of liability of one kind or another. Therefore, the court concluded that conduct that does not create any form of liability did not fall within the terms of the release and covenant, and the court instructed the jury to that effect. The court's conclusion on the interpretation of the release and covenant has not changed, so the court concludes that its instruction to the jury was not erroneous. Regarding the jury instruction defining a custom of the city, WJC does not argue that the instruction was incorrect but instead argues that the instruction was unnecessary because, according to WJC, no evidence was presented at trial that WJC had a custom of violating the rights of individuals like Mr. Jensen. Mr. Jensen requested that the jury instructions on custom remain because his position was that this particular prosecution was so widespread that it could be considered a custom. The court did not consider Mr. Jensen's position to be entirely frivolous, so the court allowed the instruction to remain. The court does not consider the decision to send the instruction to the jury to be reversible error where the instruction was correct and where the jury had the opportunity to determine whether the evidence was sufficient to meet the terms of the instruction.

WJC also argues that the court erred by not allowing evidence regarding Mr. Jensen's relationship with his former attorney, Brenda Beaton. The court considered whether to allow that evidence pursuant to a pre-trial motion, and the court determined that the evidence would be substantially more prejudicial than probative. During the trial, the court determined that Mr.

Jensen did not sufficiently raise the issue to allow testimony about the relationship to be admitted. The court does not consider either of those decisions to amount to prejudicial error.

Finally, WJC argues that its substantial rights were affected by the introduction of improper evidence and the erroneous jury instructions. Because the court does not consider any evidence to be admitted in error or any jury instructions to be erroneous, it does not need to address whether the decisions affected the substantial rights of WJC. The court concludes that WJC is not entitled to a new trial based on any introduction of improper evidence or erroneous jury instructions.

**Conduct of Counsel**

WJC's final argument is that it is entitled to a new trial on all claims based on the conduct of Mr. Jensen's counsel. "[R]epeated attempts to prejudice the jury by introducing irrelevant evidence and making inflammatory statements may require a court to order a new trial in order to prevent prejudice to the opposing party." *Moody v. Ford Motor Co.*, 506 F. Supp. 2d 823, 847 (N.D. Okla. 2007). In addition to repeated attempts to prejudice the jury, "[i]mproper or intemperate argument by counsel in summation may necessitate a new trial where it tends to arouse undue passion or prejudice on the part of the jury, thereby depriving the opposing party of a fair trial." *Mileski v. Long Island R. Co.*, 499 F.2d 1169, 1171 (2d Cir. 1974). To determine whether a counsel's conduct was prejudicial, the court should consider "the totality of the circumstances, including the nature of the comments, their frequency, their possible relevance to the real issue before the jury, the manner in which the parties and the court treated the comments, the strength of the case (e.g., whether it is a close case), and the verdict itself." *Cadorna v. City and County of Denver*, 245 F.R.D. 490, 491 (D. Colo. 2007). In order to justify a new trial, "the flavor of misconduct [must] sufficiently permeate an entire proceeding to provide conviction that

the jury was influenced by passion and prejudice in reaching its verdict." *Cox v. Wilson*, No. 15-CV-0128-WJM-NYW, 2017 WL 1632506, at *3 (D. Colo. May 2, 2017).

Although the conduct of Mr. Jensen's attorney was far from the epitome of professionalism, the court does not consider the conduct of Mr. Jensen's attorney to have risen to the level required to justify a new trial. Mr. Jensen's attorney did push the limits of pre-trial rulings by the court, but Mr. Jensen's attorney did not completely defy court orders and would generally obey orders of the court during the trial when they were given. WJC also argues that Mr. Jensen's counsel raised implications and arguments during questioning and in closing arguments. But WJC objected almost each time that occurred, and the objections were generally sustained. The court concludes that, given the totality of the circumstances, none of the conduct identified by WJC deprived WJC of a fair trial. Therefore, the court concludes that WJC is not entitled to a new trial based on the conduct of Mr. Jensen's attorney.

## MR. JENSEN'S MOTION FOR ATTORNEYS' FEES

On July 19, 2017, after the entry of judgment in this case, Mr. Jensen filed a Motion for Attorneys' Fees pursuant to 42 U.S.C. § 1988. Section 1988 provides that "[i]n any action or proceeding to enforce a provision of sections . . . 1983 . . . [or] title VI of the Civil Rights Act of 1964 . . ., the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). Under § 1988, "a prevailing plaintiff should recover an attorney's fee unless special circumstances would render such an award unjust." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983). "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Id.* at 433. "The party seeking an award of fees should

submit evidence supporting the hours worked and rates claimed" and should "exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary." *Id.* at 433-34.

As noted by Mr. Jensen in his motion, "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified." *Id.* at 435. In the Tenth Circuit, a court views such an enhancement "with caution," and the court only allows such an enhancement when "the attorney for the prevailing party was confronted with a real risk of not prevailing" and when, "absent an enhancement, the plaintiff would have faced substantial difficulties in finding counsel in the local or other relevant market." *Homeward Bound, Inc. v. Hisson Mem'l Ctr.*, 963 F.2d 1352, 1360 (10th Cir. 1992) (internal quotation marks and citations omitted). When a plaintiff does obtain excellent results at trial, "the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit" because "[l]itigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee." *Hensley*, 461 U.S. at 435. "The result is what matters." *Id.*

Based on these standards, Mr. Jensen requests a total award of $394,560.42 in attorneys' fees plus an enhancement of 25% for achieving an excellent result at trial. Specifically, Mr. Jensen is requesting an award of attorneys's fees for the 534 hours that April Hollingsworth billed at $350 per billable hour for a total of $186,900; for the approximately 497.4 hours that Ashley Leonard billed at $150 per billable hour and the approximately 62 hours that she billed at $175 per billable hour for a total of $85,452.97[2]; for the 268.5 hours that Tyler Hubbard billed at

---

[2] The Motion for Attorneys' Fees filed by Mr. Jensen does not give an amount of hours billed by Ms. Leonard, and it states that Ms. Leonard's billing rate was $150 per billable hour for the entire time she worked on this case.

$125 per billable hour for a total of $33,562.50; for the 33.5 hours that Strindberg & Scholnick, LLC billed for a focus group at rates ranging from $300 per billable hour for the most experienced attorney to $115 per billable hour for the paralegal with 10 years of experience; and for the 83.3 hours that Brenda Beaton billed at $225 per billable hour and the 208.3 hours that she billed at $300 per billable hour, along with some time billed by her legal assistant and some costs, for a total of $81,941.20. WJC opposes several aspects of Mr. Jensen's request for attorneys' fees on several grounds.

As an initial matter, Mr. Jensen is basing his request for a 25% enhancement entirely on his exceptional success at trial. Mr. Jensen has not suggested or provided any evidence, beyond a conclusory statement, that he faced substantial difficulties in finding counsel in the local market. Indeed, Mr. Jensen had multiple attorneys representing him at different stages of this litigation. Because Mr. Jensen has not provided any evidence of substantial difficulty in finding counsel, the court concludes that Mr. Jensen has not demonstrated that he is entitled to an enhancement in his attorneys' fees in this case.

**Compensability of Focus Groups**

WJC's first argument is that "focus group" billing is not compensable. In support of its argument, WJC cites to a case from this District in which the court "share[d] the skepticism expressed by the Third Circuit . . . concerning the compensability of moot court rehearsals of oral appellate arguments, particularly as to the fees charged by moot court consultants who have not entered an appearance as counsel for a party before this court or the court of appeals." *Flying J Inc. v. Comdata Network, Inc.*, No. 196-CV-66-BSJ, 2007 WL 3550342, at *23 (D. Utah Nov. 15, 2007). The standard for determining compensability of attorneys' fees for rehearsing for oral

---

However, after reviewing the number of hours worked by Ms. Leonard on this case, the court discovered that Ms. Leonard changed her billing rate in April 2016 from $150 per billable hour to $175 per billable hour.

argument or trial laid out by the Third Circuit is, not that such costs are never compensable, but that the prevailing party should only be compensated "for hours reasonably spent in the argument and its preparation, but not for excessive hours, or hours spent in learning or excessively rehearsing appellate advocacy." *Maldonado v. Houstoun*, 256 F.3d 181, 187 (3d Cir. 2001). The court agrees that excessive time rehearsing for oral argument or trial should not be compensated, but the court does not find the amount of time spent in focus-group preparation for trial in this case to be excessive. *See Moon v. Gab Kwon*, No. Civ. 11810 (GEL), 2002 WL 31512816, at *6 (S.D.N.Y. Nov. 8, 2002) ("[L]aw firms often use mooting to prepare even the most experienced litigators for trials and oral arguments, and would be ill-advised to allow their attorneys to 'perform' in court unrehearsed; indeed, lawyers have been known to rehearse entire trials before mock juries, for similar reasons. Such time is appropriately billed to clients.").

In this case, Mr. Jensen enlisted the services of another law firm, which never entered an appearance in this case, to conduct a focus group and provide related consulting services for this case. Between three attorneys and a paralegal, the firm billed a total of 33.5 hours to conduct a focus group for a two-week trial. In addition to that time, a legal intern for Mr. Jensen billed an additional 9.6 hours. The court considers the time spent conducting the focus group to be reasonable and concludes that the time spent conducting the focus group should not be deducted from the award of attorneys' fees for Mr. Jensen's attorneys in this case.

**Rates for Mr. Jensen's Attorneys**

"The establishment of hourly rates in awarding attorneys' fees is within the discretion of the trial judge who is familiar with the case and the prevailing rates in the area." *Lucero v. City of Trinidad*, 815 F.2d 1384, 1385 (10th Cir. 1987) (citation omitted). The prevailing party has the burden "to produce satisfactory evidence—in addition to the attorney's own affidavits—that the

requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984). Therefore, "[t]he first step in setting a rate of compensation for the hours reasonably expended is to determine what lawyers of comparable skill and experience practicing in the area in which the litigation occurs would charge for their time." *Ramos v. Lamm*, 713 F.2d 546, 555 (10th Cir. 1983). "The attorney's years of experience is an important factor in fixing rates." *David C. v. Leavitt*, 900 F. Supp. 1547, 1555 (D. Utah 1995).

WJC objects to the hourly rates that Mr. Jensen requested for April Hollingsworth, Brendan Beaton, and Tyler Hubbard. Ms. Hollingsworth, who graduated from law school in 1996 and started practicing employment law in 2002, requested a rate of $350 per billable hour, and she provided two declarations, one from Lois Baar and one from Christina Jepson, in support of that rate. But WJC argues that Ms. Baar has worked primarily as a mediator in recent years and has had little opportunity to examine attorney rates and that Ms. Jepson is not comparable to Ms. Hollingsworth in terms of skill, experience, and reputation because Ms. Jepson graduated first in her class from the University of Utah Law School, clerked at both the Tenth Circuit and the United States District Court for the District of Utah, is a defense lawyer for large corporations and other businesses, and works for one of the most expensive law firms in Utah. According to WJC, the better comparison for an hourly rate is with the attorneys that Mr. Jensen hired to perform a focus group. The focus-group billing shows a rate of $300 per billable hour for Erik Strindberg, who graduated from law school in 1983, and a rate of $275 per billable hour for Lauren Skolnick, who graduated from law school in 1995. Therefore, WJC argues that Ms. Hollingsworth's rate for this case should be reduced to no more than $285 per billable hour.

The court agrees with WJC that, based on the evidence provided by Mr. Jensen in this case, a rate of $285 per billable hour is the rate that best reflects the rate charged by attorneys in the community with reasonably comparable skill, experience, and reputation to Ms. Hollingsworth.

WJC also argues that the rate requested by Ms. Beaton is too high for an attorney who is not experienced in civil rights and employment law. Ms. Beaton requests $225 per billable hour for time she billed before she appeared in this litigation on April 15, 2015. For work that Ms. Beaton billed after that date, Ms. Beaton requests a rate of $300 per billable hour. Mr. Jensen does not provide any evidence to support either of those rates for Ms. Beaton. WJC requests that the court reduce the rate to $150 per billable hour in light of Ms. Beaton's inexperience in the relevant area of law.

Although Ms. Beaton is relatively inexperienced in civil rights and employment law, Ms. Beaton is an experienced attorney, and she did work with Mr. Jensen for several years before this case was filed and, therefore, had an in-depth knowledge of many of the facts relevant to this case. Therefore, the court concludes that a rate of $225 per billable hour is a reasonable rate for an attorney of Ms. Beaton's experience and skill and is consistent with other fees charged by similar attorneys in the relevant community. But the court also concludes that Mr. Jensen has not provided sufficient evidence to justify an increase in Ms. Beaton's rate to $300 in the middle of this litigation. Therefore, the court concludes that $225 per billable hour is a reasonable rate for the entirety of Ms. Beaton's compensable time in this case.

Finally, WJC argues that a rate of $125 per billable hour for Mr. Hubbard, who has only finished his first year of law school, is too high. Although Mr. Jensen did not provide any evidence to support that rate for a law student, WJC points to the rate of $150 per billable hour

for Ashley Leonard, a licensed attorney, and the rate of $115 per billable hour for Camille Marx, a paralegal for Strindberg & Skolnick with about 10 years of experience, as support for the argument that $75 per billable hour would be a reasonable rate for Mr. Hubbard.

The court agrees that a rate of $125 per billable hour is too high for Mr. Hubbard. Based on the fact that Mr. Hubbard has only finished one year of law school, that he performed some tasks that could have been performed by a paralegal, and that he has little experience even performing those tasks, the court concludes that $100 per billable hour is a reasonable rate for Mr. Hubbard.

**Reduction in Ms. Beaton's Hours**

The prevailing party in a case "bear[s] the burden 'to prove and establish the reasonableness of each dollar, each hour, above zero.'" *David C. v. Leavitt*, 900 F. Supp. 1547, 1555 (D. Utah 1995) (quoting *Mares v. Credit Bureau of Raton*, 801 F.2d 1197, 1210 (10th Cir. 1986)). "[T]he first step in calculating fee awards is to determine the number of hours reasonably spent by counsel for the party seeking the fees." *Ramos v. Lamm*, 713 F.2d 546, 553 (10th Cir. 1983). "The district court must determine not just the actual hours expended by counsel, by which of those hours were reasonably expended in the litigation." *Id.* Although plaintiff's counsel "is not required to record in great detail how each minute of his time was expended," plaintiff's counsel should at least "identify the general subject matter of his time expenditures." *Hensley*, 461 U.S. at 437 n.12. "When examining the adequacy of an attorney's billing entries, we are primarily concerned with the district court's ability to evaluate the propriety of the fee request based on the specific billing entries." *Flitton v. Primary Residential Mortg., Inc.*, 614 F.3d 1173, 1178 (10th Cir. 2010).

WJC provides two major arguments that some of Ms. Beaton's hours are non-compensable. First, WJC argues that all of Ms. Beaton's time before she entered this litigation on April 14, 2015, and after she withdrew from this litigation on June 6, 2017, is not compensable. Ms. Beaton is requesting $19,404.10 in attorneys' fees for the 83.2 hours, along with some time billed by her legal assistant and some costs, that she billed before she entered this litigation and $5,640.00 in attorneys' fees for the 18.8 hours that she billed after she withdrew from this litigation.[3] Second, WJC argues that Ms. Beaton's remaining time should be reduced by a minimum of 80% because Ms. Beaton's billing entries are so vague that they do not give sufficient information to determine whether her time was actually spent on this case.

First, the court agrees that Ms. Beaton should not be awarded attorneys' fees for time she spent on this litigation after withdrawing as Mr. Jensen's attorney. Within a week of withdrawing as Mr. Jensen's attorney in this case, Ms. Beaton was testifying as a witness at Mr. Jensen's trial. Although she included the time she spent in court testifying as a witness as part of her billing records, the court concludes that Ms. Beaton should not be awarded attorneys' fees for time she spent as a witness in this case. Ms. Beaton's descriptions in her billing entries are also so vague that the court is unable to determine whether the time was spent by Ms. Beaton preparing to testify as a witness or whether the time was spent on matters related to her work as an attorney on the case. Ms. Beaton also attempts to bill for time spent on telephone calls to and from her client after Mr. Jensen was no longer her client. For these reasons, the court agrees that Ms. Beaton's attorneys' fees should be reduced by $5,640.00.

Second, the court does not agree that any hours an attorney spends before entering an appearance in a litigation are automatically non-compensable. For example, in an employment

---

[3] WJC's Opposition to the Motion for Attorneys' Fees identifies $4,470.00 as the amount billed by Ms. Hollingsworth after June 6, 2017, but the court's calculations put the amount at $5,640.00.

retaliation case such as this one, an attorney could spend time consulting with the plaintiff, discussing the facts of the case with others, reviewing relevant documents, investigating other facts, making claims to agencies such as the EEOC and the UALD, and drafting a complaint all before entering an appearance or even before filing a complaint. Despite occurring before entering an appearance, many, if not all, of these hours could be considered hours reasonably expended in the litigation.

The difficulty in this case is that Ms. Beaton's billing descriptions are so vague that it is difficult for the court to determine whether the hours were expended in this litigation. This is especially problematic in this case because Ms. Beaton also represented Mr. Jensen in his underlying criminal case, in relation to his DUI charges, and in domestic and child custody issues. Ms. Beaton's invoices that she submitted to the court have a field labeled "Regarding" and another field labeled "Case No." that could have been used to provide helpful information to the court in determining whether the hours on the invoices were expended in this litigation, but Ms. Beaton failed to put any information in either of those fields on any of her invoices. Therefore, the court is left with only Ms. Beaton's vague descriptions to try to determine what hours are properly compensable in this litigation. For example, a large number of entries say nothing more than "Email from client," "Telephone call to client," or the similarly vague "Office visit." Nothing in those descriptions provides the court with sufficient information to determine whether the time was spent on this litigation. However, some of Ms. Beaton's descriptions are sufficiently clear to determine that the time she spent was related to this litigation and should be compensated.

Ms. Beaton is requesting $19,404.10 in attorneys' fees for the 83.2 hours, along with some time billed by her legal assistant and some costs, she spent on this litigation from October

18, 2010, until she entered her appearance on April 14, 2015. In general, the court does not consider the hours or the amount of attorneys' fees expended by Ms. Beaton during this time to be unreasonable for this type of a case. However, Ms. Beaton did not meet her burden of providing the court with sufficient information to determine that all of the hours were expended on this litigation. Therefore, the court is going to reduce Ms. Beaton's award for time spent before she entered an appearance by 50% from $19,404.10 to $9,702.05.

Finally, the court agrees that Ms. Beaton did not meet her burden of providing sufficient information in her billing entries for the court to determine whether all of her time while listed as Mr. Jensen's attorney on this case was spent on this litigation. Between the time of entering an appearance in this case and withdrawing as Mr. Jensen's attorney, Ms. Beaton billed 189.6 hours and a total of $58,067.10 in attorneys' fees. In general, the court does not consider that to be an unreasonable amount of hours or attorneys' fees for this type of a case. However, because Ms. Beaton failed to provide sufficient information in her billing entries, the court is going to reduce the amount billed by 20% from $58,067.10 to $46,453.68.

Before entering an appearance, Ms. Beaton billed 1.2 hours at a rate of $300 per billable hour. Because the court determined above that Ms. Beaton's rate should be $225 per billable hour, the court adjusts her award of $9,702.05 to $9,657.05. While listed as Mr. Jensen's attorney in this case, Ms. Beaton billed all but 1.3 hours at a rate of $300 per billable hour. After taking into account fees and time billed for Ms. Beaton's legal assistant, the court adjusts Ms. Beaton's award from $46,453.68 to $34,638.60. Therefore, Ms. Beaton's total award, before taking into account adjustments described below, should be $44,295.65.

**Other Non-Compensable Items**

In addition to the arguments already discussed above, WJC lists several other items that it deems to be non-compensable. Specifically, WJC argues that Mr. Jensen's attorneys should not be fully compensated, or compensated at all, for administrative and other non-attorney fee items; background research; time spent with unused witnesses; excessive or incorrect billing; time related to a dispute with Salt Lake County; duplicative billing; block billing with at least one non-compensable item; and time spent on motions that were withdrawn, declared moot, denied against Mr. Jensen, granted in favor of WJC, or granted in part and denied in part.

The court generally agrees that Mr. Jensen's attorneys should not be compensated for administrative or other non-attorney fee items. Therefore, Ms. Leonard's hours should be reduced by 0.9 and Ms. Beaton's hours should be reduced by 0.1 for tasks such as efiling, emailing deposition transcripts, and unspecified telephone calls to clients[4]; and Ms. Beaton's fee award should be reduced by $62.70 for non-attorney fees such as postage and parking.[5]

WJC also opposes awarding attorneys' fees to Mr. Jensen's attorneys for background research. In general, "time spent reading background cases, civil rights reporters, and other materials designed to familiarize the attorney with this area of the law . . . would be absorbed in a private firm's general overhead and for which the firm would not bill a client." *Ramos v. Lamm*, 713 F.2d 546, 554 (10th Cir. 1983). The prevailing party bears the burden of providing enough information in a billing entry for the court to be able "to evaluate the propriety of the fee request." *Flitton v. Primary Residential Mortg., Inc.*, 614 F.3d 1173, 1178 (10th Cir. 2010). In

---

[4] WJC asked that Ms. Leonard's hours be reduced by 2.3 and Ms. Beaton's by 0.6, but the court does not agree that tasks such as drafting subpoenas or noticing depositions qualify as purely administrative tasks, and several of the administrative tasks identified on Ms. Beaton's billing statements were billed at a rate of $0.00.

[5] WJC asks the court to reduce Ms. Beaton's fees by $73.65, but the court does not agree that time spent by a legal assistant preparing deposition exhibits qualifies as a non-compensable cost. The court's calculations also include cost items during the period of time before Ms. Beaton entered an appearance because the court concluded above that fees during that period were compensable.

terms of background research, the prevailing party has the burden of providing enough information in a billing entry for the court to evaluate whether the research was conducted to familiarize the attorney with an area of the law or whether the research was related to the application of legal principles to the specific facts of the case before the court. WJC identifies twelve entries that it argues are not specific enough to show that they are anything more than just background research. The court only agrees with WJC on four of the twelve entries. Specifically, the court agrees that "Research re depositions," "Research on privileges," and two entries labeled "Hearsay research" do not provide enough information for the court to determine that the attorney was performing more than just background research. However, other entries identified by WJC, including "Final policymaker research" and "Police reports as hearsay," are sufficient for the court to determine that the research was related to the application of legal principles to the specific facts of the case before the court. Therefore, the court concludes that only 4.5 hours should be deducted from Ms. Leonard's billable hours and 2.3 hours should be deducted from Mr. Hubbard's billable hours. The court also notes that the entries above suggest that attorneys and staff with the lower billable hours were performing the research tasks at issue in this case, which should generally be encouraged by courts and opposing counsel.

The court also agrees that Ms. Leonard's billing of 4.3 hours for a motion to extend fact discovery that was unopposed is excessive in the absence of a more detailed description and should be reduced to 0.6 hours. In terms of incorrect billing, Ms. Hollingsworth billed 7.5 hours for a phone call with Ms. Beaton, but Ms. Beaton only billed 0.7 hours for the same phone call. Therefore, Ms. Hollingsworth's billing should be reduced by 6.8 hours.

WJC also opposes award attorneys' fees to Mr. Jensen's attorneys for duplicative or non-essential billing, and WJC identifies five situations where it believes such billing occurred.

Although the court agrees that attorneys' fees should not be awarded for duplicative or non-essential billing, the court does not agree that all of the situations identified by WJC qualify as duplicative or non-essential billing. WJC first seeks deductions for time Ms. Leonard spent to "Put together initial disclosures" and to edit discovery responses and draft supplemental responses because the initial disclosures had already been filed and because the discovery responses were only changed and not supplemented. However, a new attorney on a case spending time reviewing and editing initial disclosures and discovery responses is not duplicative or excessive time, even if the billing entries were not phrased as precisely as they might have been. WJC also seeks to exclude time spent by Ms. Beaton traveling to and reviewing discovery documents at the Davis County Attorney's Office because Ms. Leonard was also present to review the same documents and because the documents were copied and sent to the parties. However, attorneys may reasonably decide to view actual documents to ensure that all relevant documents were copied and sent, and having two attorneys conduct the document review in this case was not unreasonably duplicative in this case considering the document review was coupled with a meeting with Troy Rawlings, the Davis County Attorney. WJC would also like to deduct time billed by Mr. Hubbard for attending a motion hearing because Ms. Hollingsworth and Ms. Beaton were also in attendance. However, the court does not consider it excessive to have a staff member attend a hearing with the attorneys, especially when the staff member likely performed a significant amount of research related to the issues being discussed at the hearing. But the court does agree that the final situation identified by WJC did involve duplicative billing. WJC notes that all three of Mr. Jensen's lawyers attended and billed for Mr. Rawlings' deposition, even though Mr. Rawlings had his own lawyer in attendance who handled objections and brought documents. WJC argues that Ms. Beaton's attendance to represent Mr. Jensen was all that was

required, and the court agrees. Therefore, Ms. Hollingsworth's 10 hours and Ms. Leonard's 10 hours related to attendance at Mr. Rawlings's deposition should be deducted.

However, the court does not agree that Mr. Jensen's attorneys should not be awarded fees for time spent on motions that were withdrawn, declared moot, denied against Mr. Jensen, granted in favor of WJC, or granted in part and denied in part. In determining a reasonable fee award, a court should first calculate "the so-called 'lodestar amount' of a fee" by taking "the product of the number of attorney hours 'reasonably expended' and a 'reasonable hourly rate.'" *Robinson v. Edmond*, 160 F.3d 1275, 1281 (10th Cir. 1998). The court should then consider "two additional questions": "(1) whether the plaintiff's successful and unsuccessful claims were related; and (2) whether the plaintiff's overall level of success justifies a fee award based on the hours expended by plaintiff's counsel." *Flitton v. Primary Residential Mortg., Inc.*, 614 F.3d 1173, 1176-77 (10th Cir. 2010). "In the context of fee awards, [the Tenth Circuit has] held that claims are related if they are based on a common core of facts or are based on related legal theories." *Jane L. v. Bangerter*, 61 F.3d 1505, 1512 (10th Cir. 1995). "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Hensley*, 461 U.S. at 435. "Normally this will encompass all hours reasonably expended on the litigation, . . . [and] the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." *Id.*

In this case, WJC requests that the court go through this litigation motion by motion and reduce attorneys' fees based on the full or partial success or failure of each motion. The court declines to take this approach. Although WJC prevailed on some of Mr. Jensen's claims at the summary-judgment stage of this litigation, all of Mr. Jensen's claims were related because they were all based on a common core of facts, and many of Mr. Jensen's unsuccessful claims were

also based on related legal theories. In addition to all of the claims being related, Mr. Jensen achieved a high level of success at trial, which the court concludes justifies a fee award based on the hours expended by Mr. Jensen's attorneys. For similar reasons, the court denies WJC's request to deduct time from the attorneys' fees related to information and witnesses that were not used at trial.

WJC also argues that Mr. Jensen should not receive attorneys' fees related to motions in which Magistrate Judge Dustin B. Pead declined to award fees to either party. However, Magistrate Judge Pead was basing his decision not to award fees on Federal Rule of Civil Procedure 37(a)(5)(C) and was not making a determination as to whether the court should award fees to Mr. Jensen as the prevailing party on his claims at trial. Therefore, the court concludes that awarding Mr. Jensen attorneys' fees for time spent on those motions is not inconsistent with Magistrate Judge Pead's decisions, and the court declines to reduce the award of attorneys' fees for those motions.

Applying all of the adjustments described above, the court awards the following in attorneys' fees to Mr. Jensen's attorneys: $147,402 for Ms. Hollingsworth; $44,210.45 for Ms. Beaton; $82,887.97 for Ms. Leonard; $26,620 for Mr. Hubbard; and $6,403.75 for Strindberg & Scholnick, LLC. Therefore, the court awards Mr. Jensen a total of $307,524.17 in attorneys' fees.

## CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that WJC's Motion for Reduction of Damages [Docket No. 345] is GRANTED, Mr. Jensen's Motion to Alter or Amend the Judgment [Docket No. 349] is DENIED, WJC's Motion for Judgment as a Matter of Law [Docket No. 331] is DENIED, WJC's Renewed Motion for Judgment as a Matter of Law

[Docket No. 363] is DENIED, WJC's Motion for a New Trial [Docket No. 378] is DENIED, and

Mr. Jensen's Motion for Attorneys' Fees [Docket No. 366] is GRANTED in part and DENIED

in part.

DATED this 13th day of October, 2017.


BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge